NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-101

STATE OF LOUISIANA

VERSUS

NANCY ROGERS
A/K/A NANCY LYNN ROGERS

**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C 19590
HONORABLE JOHN MARION ROBINSON, DISTRICT JUDGE

**********

PER CURIAM

**********

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Jonathan W. Perry, Judges.

AFFIRMED.

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P.O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT APPELLANT:**
**Nancy Rogers**

**Nancy Rogers**
**In Proper Person**
**16277 Hubbs Road**
**Pride, LA 70770**
**(337) 988-0200**
**DEFENDANT APPELLANT**

**Madeleine Slaughter Young**
**Attorney at Law**
**1900 N.18th St., Suite 433**
**Monroe, LA 71210-0000**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**Christopher N. Walters**
**Assistant Attorney General**
**P.O. Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6200**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**PER CURIAM:**

Defendant, Dr. Nancy Rogers, appeals her no contest plea to obstruction of justice, a violation of La.R.S. 14:130.1, for which she received a sentence of two years at hard labor, suspended, two years supervised probation, with 600 hours of community service per year in lieu of fines and costs. This court affirms Defendant's conviction on appeal.

**FACTUAL AND PROCEDURAL BACKGROUND:**[1]

On June 19, 2012, a fire, later determined to be caused by arson, occurred at a Natchitoches bed and breakfast. Following an investigation, Defendant was charged by bill of information filed on January 17, 2013, with simple arson of a bed and breakfast, a violation of La.R.S. 14:52. On December 27, 2017, an amended bill of information was filed, charging Defendant with aggravated arson of a residence, a violation of La.R.S. 14:51. A second amended bill of information was filed on March 16, 2018, and charged Defendant with aggravated arson of a residence and obstruction of justice, a violation of La.R.S. 14:130.1. On June 11, 2018, the State filed a third amended bill of information that charged Defendant with aggravated arson of a residence and obstruction of justice. The State amended the bill on December 10, 2018, to correct grammatical and punctuation errors.

On December 10, 2018, the day trial was set to begin, Defendant entered a no contest plea. As part of the plea, the State agreed to dismiss the aggravated arson charge at sentencing. Prior to sentencing, on January 23 and January 25, 2019, Defendant filed a pro se "Motion for Withdrawal of Coerced Involuntary Plea and Motion for Court Appointed Co-Counsel to Assist Pro Se Criminal Defendant."

---

[1] Additional pertinent facts of this case will be discussed under the relevant assignments of error sections.

Hearings on the motion were held on August 16, 2019, September 13, 2019, and October 29, 2019. The trial court denied the motion on October 29, 2019. Thereafter, Defendant waived sentencing delays, and the trial court ordered Defendant to serve two years at hard labor, which was suspended, and Defendant was placed on two years of supervised probation. In lieu of fines and court cost, Defendant was ordered to perform 600 hours of community service per year of supervised probation, which consisted of providing free medical services to the indigent. The State then dismissed the aggravated arson charge. A motion to reconsider sentence was filed on November 15, 2019, and denied on November 18, 2019. A Notice of Appeal was filed on November 26, 2019, and granted the following day.

Defendant is now before this court asserting six counsel-filed assignments of error and twenty-one pro se assignments of error as follows:

**Counsel-Filed Assignments of Error:**

      I.      The trial court erred in ignoring its own orders by turning its microphone off and/or failing to have all bench conferences and other proceedings recorded, thereby depriving Dr. Rogers of her constitutional right to a complete record on appeal.

      II.      The trial court erred in accepting Dr. Rogers' open ended plea of no contest to obstruction of justice when there was no factual basis, the statute of limitations may have prescribed, she was not informed of the possible penalties, was under extreme duress, and may have been threatened.

      III.      The trial court erred in denying Dr. Roger's [sic] motion to withdraw her plea as compelling evidence was presented [that] she did not knowingly and intelligently enter a plea of no contest.

      IV.      The State vitiated the plea agreement entered into with Dr. Rogers when a pending arson charge mysteriously appeared on the 10th JDC Clerk of Court'[s] website over eight months after it had been dismissed.

      V.      A former judge in Dr. Roger's [sic] case erred as she should have self-recused herself prior to denying defense counsel's

2

motions to quash and motion to dismiss, instead of waiting two years to self-recuse based on appearances of impropriety she knew and/or should have known existed when she accepted the case and had it transferred to her division.

VI.     The State and trial court were both vindictive when Dr. Rogers asserted her constitutional right to trial by jury. The State in amending the Bill of Information to aggravated arson after four years, based on the same set of facts.  The court, in seeking *sua sponte* to revoke Dr. Rogers' probation despite the recommendation of Probation and Parole she be released.

**Pro Se Assignments of Error:**

1.     The trial court committed legal error when it accepted an involuntary and uninformed no contest plea to obstruction of justice.

2.     The trial court committed legal error when it denied appellant's motion to withdraw her involuntary and uninformed plea.

3.     The trial court committed legal error when it violated appellant's constitutional right to an unbiased judge.

4.     The 4th trial judge committed legal error that violated appellant's rights to an unbiased judge when he failed to adhere to the provisions of La. C.Cr.P. Art. 674 which requires the trial judge to either grant a motion for recusal or refer the motion to another judge.

5.     The 4th trial judge committed legal error when he deemed appellant's September 2019 motion for recusal untimely since appellant did not discover the grounds for recusal until the judge violated her substantial rights just prior to filing her motion for recusal.

6.     The 4th trial judge committed egregious legal error on December 05, 2018 when he deprived appellant of her fundamental right to compulsory jury summons shortly after his decision to bar testimony from Drs. Juneau and Nemeth.

7.     The 4th trial judge committed legal error when he admitted on September 13, 2019 that he participated in appellant's plea and "tried to help find something for appellant to plead guilty to in order to save her son."

8.     The trial court committed legal error when it failed to adhere to the statutory requirements for the essential elements for Obstruction of Justice La.R.S. 14:130.1.

9.     The trial court committed legal error and violated appellant's substantial rights when it accepted a plea from a defendant who put the court on notice that she was innocent.

10. The trial court committed legal error and violated appellant's fundamental right to counsel when it granted an ex parte motion from defense counsel to withdraw without the hearing mandated by Rule 9.13.

11. The trial court committed egregious legal error on August 16, 2019 by violating appellant's fundamental right to effective counsel.

12. The trial court committed legal error and violated appellant's constitutional rights by accepting a plea obtained in an atmosphere of substantial coercion.

13. The trial court committed legal error when it violated its own March 2018 order to record all side bars.

14. The trial judge committed legal error and violated appellant's substantive rights when he failed to comply with the provisions of La. C.Cr.P. Art. 556.1 which requires the trial judge to advise the accused of any potential sentence exposure and the nature of the charges.

15. The trial court committed patent legal error when it ignored the requirements of La. C.E. Art. 507.

16. The trial court committed legal error by barring testimony from appellant's expert witnesses Dr. Juneau and Dr. Nemeth 5 days prior to trial and immediately after the state advised the trial court that it was charging appellant's son as a co-conspirator.

17. The state committed prejudicial legal error and misconduct when it failed to inform appellant that a key witness who had conducted an interview admitted into evidence in June 2018 was not available to authenticate said evidence.

18. The trial court engaged in judicial vindictiveness that violated the appellant's rights.

19. The trial court committed legal error when it allowed the state to engage in a prohibited pattern of prosecutorial vindictiveness and other misconduct which violated appellant's due process rights and exceeded the accepted boundary of prosecutorial discretion.

20. The state committed reversible legal error and violated appellant's right to due process by failing to provide exculpatory evidence seized during a July 19, 2012 search warrant.

21. The state committed legal error that violated appellant's

4

rights when it denied the existence of any financial recovery that would establish Jared Dunahoe as a potential suspect.

(Citations to record omitted).

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENTS OF ERROR NUMBERS II & III; PRO SE ASSIGNMENTS OF ERROR NUMBERS 1, 2, 8, 9, 12 & 14:

As numerous assignments of error relate to the entry of Defendant's plea and the withdrawal thereof, this court will first set forth the pertinent facts relating to those proceedings.

**Proceedings Relating to Defendant's Plea:**

Trial was set to begin on December 10, 2018. At the beginning of the proceeding, the State informed the trial court that it was filing a "Motion to Compel Testimony of Greg Hall." Greg Hall ("Hall") is Defendant's son.[2] In that motion, the State asserted "[n]o charges are pending against said witness[.]" The prosecutor thought the defense understood that it could compel Hall to testify, if he was given immunity, and the State was "giving him immunity." The prosecutor also stated the defense had been given a copy of the document. Defense counsel did not object to the motion. The State then amended the bill of information. The trial court noted the jury venire was ready to proceed; however, it understood the matter would be resolved by a no contest plea.

---

[2] Hall's full name is Gregory W. Hall, Jr.

5

Prior to Defendant entering a plea, the court questioned Defendant, who denied being under the influence of any type of medication or anything that would disrupt her normal senses. Defendant acknowledged that she had the opportunity to discuss her case with counsel. The trial court then informed Defendant of her *Boykin* rights, and she indicated she understood those rights and would be giving up those rights. The exchange between Defendant and the judge continued:

> THE COURT: All right. Other than the plea arrangement has there . . . well, other than the plea arrangement, which as I understand it will involve a No Contest plea with a PSI being ordered by the Court and Dr. Rogers being allowed to remain on the same amount of bond which would convert to a PSI bond . . . with sentence up to the Court. I have had some discussion with your attorneys about potential sentences, but I would need to have the PSI in hand before I would know for sure. Do you understand that?
>
> DR. ROGERS: I don't . . . I don't know what a PSI is.
>
> MR. GUILBEAU: Pre-sentence . . .
>
> THE COURT: It's a Pre-sentence Investigation . . .
>
>     . . . .
>
> THE COURT: . . . that the Department of Probation and Parole would put together for me, okay?
>
> DR. ROGERS: Yeah, my life is pretty much an open book.
>
> THE COURT: Okay.
>
> DR. ROGERS: (Inaudible).
>
> THE COURT: So, other than the plea arrangement which has been detailed for the record already, have there been any other promises made to you to get you to plead guilty . . . I'm sorry, to get you to plead No Contest? Any other promises?
>
> DR. ROGERS: That this would relieve my son of any burdens.
>
> THE COURT: Right.
>
> DR. ROGERS: That my son would be left alone.

6

THE COURT:          Right.

DR. ROGERS:          Yes.

THE COURT:          Right. Okay. Have there been any kind of threats made against you to get you to plead guilty?

DR. ROGERS:          Not today, no.

THE COURT:          Okay, so you're pleading . . . I'm sorry . . . No Contest. All right, then we will still need to have a factual basis stated for the record to support the No Contest.

The State then presented the following factual basis:

[T]here's a residence at 358 Jefferson Street, in Natchitoches, Louisiana. On June 19, 2012, it was burned to almost total destruction. Nancy Rogers had been at the building the day before. There were witness who saw her there and spoke with her. We would have them present at trial. After the building was burned, the Fire Marshal determined that there was arson. He determined that it was an incendiary fire caused by gasoline. There [are] expert witnesses that will testify of the testing they did. The State would call witnesses in the case, including Greg . . . Gregory Williamson . . . Hall Jr., the State has given him immunity in the case to testify, so that he has no Fifth Amendment privileges.

MR. GUILBEAU:          Just a moment. Your Honor may we have a side bar?

BENCH CONFERENCE BEGINS

(Counsel approaches the bench. The Court, nor the attorneys are near a microphone, voices are inaudibly speaking.)

THE COURT:          All right.

MS. SLAUGHTER-YOUNG:   As long as she understands.

          . . . .

BENCH CONFERENCE ENDS

          . . . .

MR. ROBIDEAUX:          Could we redo the uh . . . factual basis.

MS. SLAUGHTER-YOUNG: . . . the State doesn't contend that they. . . the State doesn't contend that the immunity agreement is part of the factual basis. So, I will remove that from the factual basis.

. . . .

MS. SLAUGHTER-YOUNG: So, the State determined that that there was arson. The defendant became a suspect. She gave statements. There was an investigation done that led the State to conclude that she was guilty of arson. She was charged with aggravated arson and obstruction of justice. And she's pleading to obstruction of justice.

. . . .

. . . The obstruction is very broad statuted (phonetic). It consist[s] of lying to the police. The State would be able to demonstrate that she gave, the police evidence back and forth . . . false alibi, claiming she was in Lafayette all night, making several claims. And we have a recorded statement of her that shows several inconsistencies . . .

. . . .

. . . with the actual facts which would lead us to prove, in my opinion, without a doubt, that she was guilty of obstruction of justice.

. . . .

MR. GUILBEAU: And, Your Honor, the recorded statements specifically is [sic] with our [sic] investigator, Chad Parker.

Defendant was then asked if the facts were correct and the following occurred:

DR. ROGERS: That there was a fire, yes.

THE COURT: The inconsistencies . . .

DR. ROGERS: And that I was accused of being an arsonist, that's correct.

THE COURT: The inconsistent statements.

MR. GUILBEAU: And that you gave false statements (phonetic) . . . (inaudible), yes?

DR. ROGERS: They say that I did.

MS. SLAUGHTER -YOUNG: No.

8

MR. GUILBEAU: And you are agreeing to that? You are pleading to that?

MR. ROBIDEAUX: No Contest.

MR. GUILBEAU: You are pleading No Contest to (inaudible).

DR. ROGERS: Okay. I'm pleading No Contest . . .

THE COURT: All right.

DR. ROGERS: . . . to the fact that they are accusing me . . .

MR. GUILBEAU: Of false statements.

MS. SLAUGHTER -YOUNG: No, no, no, no.

DR. ROGERS: . . . of not saying that I was at the McDonald's.[3]

MS. SLAUGHTER -YOUNG: No.

MR. GUILBEAU: (Inaudible) . . . false statements (inaudible).

DR. ROGERS: I did not have an opportunity to tell Chad Parker . . .

MR. GUILBEAU: (Inaudible).

DR. ROGERS: . . . that I was at the McDonalds.

MR. GUILBEAU: (Inaudible).

DR. ROGERS: I gave a statement that I was in Lafayette.

After the court found a factual basis for the plea, Defendant formally entered a plea of no contest, and the court accepted her plea. The judge questioned defense counsel regarding Defendant's plea. Thomas Guilbeau and Jason Robideaux, Defendant's counsel at the time, indicated Defendant made a knowing and intelligent

---

[3] The prosecution alleged that Defendant gave a statement to the fire investigator that she remained in Lafayette from approximately 9:00 p.m. on June 18, 2012, until June 19, 2012, when she appeared for work. However, allegedly, a McDonald's receipt and video placed Defendant in Alexandria at 5:18 a.m. on June 19, 2012.

9

waiver of her rights. Guilbeau also confirmed that the arson charge would be dismissed as part of the plea agreement. The state responded, "Right . . . at sentencing."

Defense counsel subsequently inquired about the applicability of La.Code Crim.P. art. 893. However, the State did not approve entry of the plea under La.Code Crim.P. art. 893 but noted the judge could order it. The issue was deferred to sentencing.

Prior to the sentencing hearing, Defendant filed a motion to withdraw her plea. Therein, Defendant asserted:

1.  Defendant maintains that on December 10, 2018 she was experiencing severe emotional distress which impaired her judgment and decision making abilities. . . .

2.  The severe emotional distress experienced by defendant on the morning of December 10, 2018, severely impaired defendant's ability to fully understand the factual basis and consequence of her plea as well as the ramifications and terms of her sentencing. . . .

3.  The panic and fear that were precipitated by the prosecutor's last minute decision to charge defendant's brain damaged and estranged son just prior to jury selection clouded the defendant's judgment and prohibited her from fully understanding her trial rights and the full consequences of her plea.

4.  Defendant further maintains that due to the hastily staged last minute judicial maneuvers and her impaired mental state she was not given adequate time to deliberate on her plea nor was she advised that anything other than a suspended sentence under Article 893 would be possible.

5.  Defendant asserts that her hired counsel, Thomas Guilbeau, provided ineffective assistance and used cruel, intimidating[,] and coercive tactics to obtain a rushed plea in order to avoid the inconvenience of having to participate in a trial.

6.  As a result of the foregoing, defendant maintains that her plea was not entered into freely and was in fact involuntary. Despite the self[-]serving assertions of Mr. Guilbeau and Mr. Robideaux, the defendant's waiver of her rights was neither knowing or intelligent. Defendant was not given any of the documents that were filed at

10

the last minute by the prosecution, nor was she informed by her counsel of the potential consequences to her defense. Defendant was never informed that the prosecution had to compel her son to testify the way they wanted him to since he had given conflicting statements after his brain injury.

7.  Defendant[']s plea also failed to comply with the requirements of Article 556.1(A) (1) because she was never informed of the maximum possible penalty of 20 years in prison at hard labor.

Defendant suggested that at all times prior to December 10, 2018, she insisted she was innocent of all charges and repeatedly rejected multiple plea offers. Moreover, she believed she had a high likelihood of acquittal on all charges. Defendant's motion was accompanied by a memorandum in support thereof. She also attached an affidavit executed by herself, an affidavit from Rhonda Welborn, Defendant's friend;[4] a letter from Dr. Darlyne Nemeth,[5] clinical, medical, and neuropsychologist; and a report from Dr. Rafael Salcedo, forensic psychologist.

Defendant's affidavit stated she was under extreme emotional distress on December 10, 2018, after she was informed that her son was going to be prosecuted along with her unless she agreed to the plea bargain that her counsel had been pressuring her to agree to since June 2018. She stated she had been adamant about not pleading guilty to anything despite the fact that the prosecution threatened her with a long prison sentence if she did not agree to a plea. Defendant asserted nothing prepared her for the last-minute threat to prosecute her son, Hall. Defendant contended she did not have a clear memory about the court proceeding that took place. She remembered extreme confusion when the State attempted to place facts on the record. Defendant alleged that defense counsel told her she better take the

_____

[4] Welborn's last name is spelled inconsistently throughout the record. Thus, this opinion uses the spelling found in her affidavit.

[5] Dr. Nemeth's name is spelled inconsistently throughout the record. Thus, this opinion uses the spelling found on her letter.

plea fast because she and her son were going to jail. She subsequently started having flashbacks of when she found her son in a pool of blood following a beating in her home on May 13, 2014.[6] Defendant believes the beating was related to the Natchitoches fire. Defendant recalled her attorneys telling her she would receive a suspended sentence and her record would be expunged. Defendant further alleged that defense counsel told her on December 5, 2018, that the State intended to prosecute Hall. Defendant asserted she took Nyquil the night prior to her plea and Benadryl on the day she pled. She asserted that Guilbeau convinced her to take a plea to spare her son. Defendant experienced a lot of emotional and physical distress with severe abdominal pain and nausea. Defendant alleged she did not know how she made it home. Her friend, Welborn, informed Defendant that she had defecated on herself and was acting strange. Defendant did not recall this. She also alleged she had to seek "psychological help because of the mental distress precipitated by the horror of seeing" her son in court "where he allegedly was being threatened with prosecution" and online posts threatening her with physical harm. Defendant noted that she watched the video of her son's statement on June 19, 2018.[7] After an in chambers discussion, defense counsel told Defendant she would be spending the rest of her life in prison if she did not accept the plea deal. On June 22, 2018, defense counsel pressured Defendant into agreeing to a plea bargain.

---

[6] Both Defendant and her son were beaten in her home in Lafayette. Regarding the beating, Defendant indicated that she got home late due to traffic. When she arrived, there were two men in her home who beat her with a baseball bat and told her to keep her mouth shut about what happened in Natchitoches and to stop asking for a trial. Hall was bound with tape and lying in a pool of blood when she found him, and she was not there to help him. The motive for the attack was not determined and the perpetrators were not apprehended. It is alleged that Hall sustained brain damage from the attack.

[7] Hall gave a statement, which was video recorded and then transcribed, to Captain Abbott and the LSU police. In his statement, Hall alleges that Defendant made him sign an affidavit stating he was with Defendant at the time of the fire. However, Hall asserts he was not, in fact, with Defendant.

Welborn's affidavit stated that Defendant was very upset on December 10, 2018, when she saw Hall being taken into custody by the Attorney General. She was also distraught because Hall refused to speak to her because he thought she was responsible for the 2014 attack on him. Defendant went into a side room with counsel, and upon her return was ashen, shaken, and unable to speak. While driving home, Defendant began screaming, shrieking, and crying. Defendant also soiled herself.

The letter from Dr. Nemeth set forth Defendant's treatment history. Of note was Defendant's treatment for adjustment disorder with anxiety, which occurred from October 21, 2011, through January 12, 2015. Defendant contacted Dr. Nemeth regarding trial for the charged offense. However, Dr. Nemeth's testimony was not allowed. Dr. Nemeth referred Defendant to Dr. Salcedo for a retrospective evaluation regarding her plea.

Dr. Salcedo's report indicated he conducted a psychological evaluation of Defendant on January 14, 2019. Defendant reported she was coerced into entering a plea because of threats that her son would be indicted as a co-conspirator, and the two would receive lengthy sentences. Dr. Salcedo reported "[s]he states that a large part of her reasoning at the time involved protecting her son from any legal jeopardy." She reported being extremely anxious, panicky, and confused during the plea proceeding. At the time of the evaluation, Defendant "clearly deeply regretted having entered the nolo contendere plea[.]" She pled under duress to avoid her son having to go to prison. Dr. Salcedo also concluded:

> [there was] objective evidence that almost immediately following the proceeding, she was so emotionally and psychologically distraught that she lost control of bodily functions, apparently urinating and defecating on herself. Subjectively, she recalls being extremely anxious, confused, and dizzy. She had a friend who observed this behavior . . . . Perhaps

more importantly, Dr. Rogers, at least according to her, was threatened with the possibility that her son might be indicted as a co-defendant with her, and face similar penalties, if she did not agree to plead nolo contendere. This would appear to represent a case of possible undue influence negating the "freely and voluntary" requirement of entering a nolo contendere plea.

Testimony regarding the motions was adduced on August 16, 2019, September 13, 2019, and October 29, 2019. On August 16, 2019, the State called Defendant's previous attorneys, Guilbeau and Robideaux, to testify. Defense counsel reserved his right to cross-examine them at a later date.

Guilbeau represented Defendant for five- and one-half years. Robideaux, Guilbeau's partner, also represented Defendant. Guilbeau filed a motion to withdraw as counsel once he received Defendant's motion to withdraw her plea. His motion was granted in January 2019. Guilbeau testified that he and Defendant discussed the possibility of Defendant filing a motion to withdraw her plea at his office on December 18, 2018, before he withdrew as counsel. Guilbeau said he informed Defendant that once she made allegations of ineffective assistance of counsel his conversations with her concerning his representation would be open, and any privilege would be waived. Guilbeau testified that Defendant understood this. Guilbeau also testified that Defendant was aware the interview was being recorded, and the two spoke about it during the interview. Moreover, Defendant agreed to be recorded.

Guilbeau recalled his December 18 conversation with Defendant:

> She was upset about twenty different things, none of which had to do with her not understanding the proceedings that went on when she entered her plea. She did say, she said over and over again, she complained about the judge, she complained about you, she complained about the Dunahoe's, she complained about probation. I could go on and on and on. And we had a long talk. I told her she had made a good and valid knowing, intelligent plea . . . . And that it was a marvelous deal because upon sentencing, the arson charges are dismissed, the

14

Judge had indicated to us he would give her a suspended sentence and we felt like that was true and it was in good faith. She attacked that over and over again but she never attacked that when we did our plea. But on the [1]8th, she's talking about everything else in the world except that she was coerced into it. . . .

. . . .

. . . I think she says two points about she wasn't really clear what she was doing. She said she was very upset.

According to Guilbeau, Defendant was upset with the possibility of a sentence.

According to Guilbeau, Defendant was very emotional, had outbursts, interrupted, would not stop talking, and hammered people with questions. He put up with her behavior for more than five years. Guilbeau refused to file the motion to withdraw plea because he felt it was a fraud on the court because the plea was knowing and voluntary. At the conclusion of the interview, he was hopeful that Defendant would not file the motion to withdraw her plea. Moreover, during that conversation, Defendant never accused Guilbeau of wrongdoing. Robideaux was not present at the meeting.

Guilbeau testified about Dr. Nemeth's letter regarding Defendant. That letter was dated January 10, 2019. Dr. Nemeth was a friend of Defendant who helped with Defendant's divorce and custody of Defendant's son. According to Guilbeau, Dr. Nemeth said she thought a forensic psychologist should do a retrospective evaluation of Defendant. Guilbeau did not have any grounds to question Defendant's mental state prior to and at the time of her plea on December 10, 2018. Defendant was oriented as to person, place, and time when she entered her plea. "She was intelligently engaged with" Guilbeau and Robideaux as her attorneys on the topic of accepting a plea. They discussed the possibility of a plea bargain many times. Guilbeau testified that a week before the plea he and Robideaux pointed out the

15

"problem of her son, who on video, that had been allowed into evidence claimed that she had burned down the house in Natchitoches and she had told him to lie about him being with her in Alexandria and that the affidavit that he signed with her notary public was false." Defendant's son also gave a statement to LSU police blaming her for his false statement, and she was in court at a previous hearing when that video was played.

Guilbeau was asked if he was aware of any decision by the State just prior to jury selection on December 10, 2018, to charge Defendant's "brain damaged and estranged son." Guilbeau was not advised of any charges being filed against Hall, and Guilbeau did not threaten Defendant with that possibility. Guilbeau was aware, however, that the State filed a motion to compel testimony from Defendant's son, and he thought he received a copy of the motion on December 10. Moreover, Defendant was aware the motion was filed, although she may not have been provided with a copy of it. Guilbeau and Defendant had discussed the possibility that the State could force Hall to testify many times, including prior to Hall's arrival in court. Guilbeau agreed that Defendant understood that the State could, and probably would, compel Hall to testify. Guilbeau testified that Defendant's biggest concern was seeing Hall show up in court, and he showed up on December 10. Guilbeau discussed the matter with Defendant, and she was upset. Guilbeau testified:

> She came up to me and she was upset and she said, he's here, he's here, and what am I going to do. I said well[,] we were worried about this all along. And he's with somebody and she's kind of talking about it and I said just settle down, it is what it is. We need to go, we're about to pick a jury and I was trying to show her how the jury charts work.

Guilbeau testified that he did believe Defendant was "in fear."

Guilbeau felt Defendant was given adequate time to deliberate on her plea as he and Robideaux had gone over "this sort of scenario" with Defendant numerous times before December 10. Guilbeau further testified:

> [B]efore we went out, Judge Robinson said, he wants to make one last effort to plea bargain this case. He told that to you and me. And we did. We made one last effort and at that point the State agreed that it would let her plead no contest to one count of obstruction of justice which had to do with the fire marshal Chad Parker and she would get a suspended sentence and she would not pay any fines or cost or restitution.

Guilbeau testified that "ten or fifteen minutes was talking to her about it. But that's all it took." Defendant was spoken to in a small courtroom and was told "what was what. And no one could get around the fact that [Hall] was in court and [Hall] was going to testify." Guilbeau stated Defendant was one of the smartest clients that he had ever had. He further testified she was not a person who does not understand things. "[S]he understands it and takes it a part [sic] six different ways." According to Guilbeau, Defendant was advised she was pleading to obstruction of justice with regard to the fire marshal, and the penalty was up to twenty years. However, she was not going to receive that sentence or anything close to that. She would receive a "suspended sentence, "in [his] mind, because that's what the judge just told [them] and the prosecutor did not object to." Defendant was advised that something other than a suspended sentence was possible, but the court had agreed to give her a suspended sentence. She was additionally told what a pre-sentence investigation was. Guilbeau denied he provided ineffective assistance and used cruel, intimidating, and coercive tactics to obtain Defendant's plea. Guilbeau stated, "that's an interesting statement because anyone who knows Dr. Rogers knows that if you tried something like that with her, she'd take you apart. No. That did not happen." Guilbeau did not feel Defendant was capable of being intimidated by him.

17

In fact, he had never seen her intimidated by anyone. However, "[s]he was afraid though she would face the music when her son showed up and she agreed to plea[d] on that basis." Guilbeau said Defendant was fearful and anxious but was not in a panic mode "where she was running around with her hair on fire and doing the insanity thing." He did not use any tactics to get Defendant to plead. He explained the law to her, told her it was a good deal, "and went over it six different ways." Guilbeau saw no indication during Defendant's plea that it was not given freely and voluntarily.

As far as the possible penalty for obstruction of justice, Guilbeau testified that he informed Defendant of the maximum sentence. Guilbeau was further questioned:

Q.     Okay. But in fact, did you tell her that after your discussion with the judge, after her son showed up . . .

A.     That's right.

Q.     . . . did you tell her that the judge reiterated that he intended to give her a suspended sentence?

A.     I did. Absolutely.

Q.     Okay. But did she also understand that that was not hard and fast, that there was a pre-sentence investigation?

A.     That's correct.

Q.     Okay. So generally, your, based on your five-and-a-half-years representation of [Defendant], other than the defendant becoming fearful when her son showed up in court on December 10, 2018, do you feel that she was under any sort of severe emotional distress?

A.     No. Not enough to understand what was going on and what we were discussing with her after about the plea.

Q.     And if she told some friend of hers or some psychologist friend of hers subsequently that she was under severe emotional distress[,] would you dispute that?

18

A.    Absolutely, I just, I think she was upset, I don't mean that, but not upset to the point where she did not fully understand what was going on and intelligently made the decision to plead at our recommendation.

Guilbeau saw the evaluation by Dr. Salcedo attached to Defendant's motion to withdraw her plea. Guilbeau testified that Dr. Salcedo's opinion about Defendant was contrary to the opinion he expressed in *State v. Young*, 11-46 (La.App. 4 Cir. 8/17/11), 71 So.3d 565.[8] Guilbeau paraphrased Dr. Salcedo's opinion in *Young* as "unless a person was suffering from extreme psychosis or mental disease, it was ridiculous to say that a person couldn't know right or wrong from entering into a guilty plea." Guilbeau testified: "Never, never did she not understand what was going on. Never did, was there any coercion or any threats made against her." Guilbeau testified that Defendant did not exhibit any paranoia on the date of her plea. Furthermore, no one in Guilbeau's office coerced Defendant or was hostile toward her.

Guilbeau also testified that Defendant was always in control of her mental faculties. However, she appeared to be angry on December 10, 2018. Guilbeau further testified:

We kept coming back to the fact that the arson was over, they dropped that, you were going to get a suspended sentence. [Hall] is gonna [sic] convict you of obstruction of justice. It was easier to say that. And we think the jury will agree with him. And it will make a train wreck out of your case[,] but you will definitely in our opinion, be guilty of obstruction of justice. We did not think she was guilty of arson. And so that always had a problem, she had a problem with that because she

---

[8]  In *Young*, 71 So.3d 565, the defendant filed a motion to withdraw his guilty plea to second degree kidnapping, claiming he lacked the capacity to enter a knowing and voluntary plea. A sanity commission was appointed to evaluate the defendant after he pled. Dr. Salcedo was a member of that commission. At the competency hearing, Dr. Salcedo testified that while the defendant exhibited symptoms of post-traumatic stress disorder from a history of sexual trauma, the disorder was not the type that would "so gravely impair an individual such that it would render a person incapable of understanding that he was entering a guilty plea." *Id*. at 573. Dr. Salcedo further testified that "'an individual's ability to understand the difference between entering a guilty plea and a not guilty plea is such a basic simple fundamental one that it would require either severe mental retardation or severe psychosis to override that[.]'" *Id.*

was, she was hung up on the fact that she was innocent of arson and then all of a sudden it was dismissed[,] and she had to plead to obstruction. She had to plead to obstruction because in my opinion, she had obstructed justice with the client, her son and had him sign a false affidavit and give me a false statement.

. . . .

. . . So angry, upset, other than that she was a composed, she was present as to time and place. She asked intelligent questions and we answered them.

Guilbeau acknowledged he had heard the statement made by Hall, who stated Defendant admitted she committed arson. Guilbeau understood there would be some evidence that Defendant committed arson. Guilbeau agreed that he did not think arson could be proven. Defendant understood that if Hall testified it would be "hell to pay." Guilbeau made the judge aware that Hall was present in court. There was an in chambers discussion between the State and the judge regarding sentencing. Guilbeau then told Defendant the judge was willing to give her a suspended sentence without fines, costs, and restitution. Guilbeau also explained a no contest plea to Defendant. He additionally informed her there was a "possibility of getting 893." Guilbeau thought they had to take the deal.

I didn't see getting around the fact that, and it gets, it got harder for me not to be upset because [Hall] coming to court and testifying, he also signed a false affidavit that he gave before a notary public. And he also false, told me falsely in the office. So, he was going to bring this story in[,] and it was a very credible one at that point. He also, in [Hall's] statement, he mentions other people that she brought into my office at different times as being maybe involved in some of this (inaudible). And that made sense.

Guilbeau said he told Defendant that if she did not enter a plea her trial would proceed because jury selection was set to begin. Defendant never indicated she wanted to proceed to trial. Defendant was not happy about it but accepted the deal. According to Guilbeau, Defendant absolutely understood.

Robideaux, Guilbeau's partner, testified that he was present on December 10, 2018, for Defendant's trial, and the defense was prepared. Robideaux saw Hall in court and was not disturbed or surprised by Hall's appearance. He was present when Hall's statement was previously played in court and had reviewed the statement many times. As a result of Hall's appearance, Robideaux and Guilbeau approached the State and asked to discuss the previous plea offer with the judge. This occurred after defense counsel had discussed the matter with Defendant. Defendant was aware the attorneys were going into chambers to discuss whether the plea was still open. Guilbeau subsequently discussed the plea with Defendant individually, Robideaux discussed the matter with Defendant, and then the two attorneys discussed it with her together. Robideaux testified there was nothing coercive, cruel, or intimidating done by Guilbeau. According to Robideaux, there was nothing rushed about the plea, but they were under the constraints of having the jury present. He understood the State had the right to withdraw the plea at any time and proceed with the trial. Robideaux never made any assertions that Defendant's plea was not knowing and intelligent. Moreover, Defendant never said she was entering the plea only because Robideaux was coercing her.

According to Robideaux, when the factual basis was given for the plea, it was interrupted because defense counsel felt the State may have been going into the arson charge. A sidebar occurred. After, the factual basis was started over and focused on Hall and Defendant's statement to the fire marshal. Robideaux told Defendant that, based on the in chambers discussion, there was a real possibility she would get a suspended sentence. However, it was up to the judge. He felt there was nothing about Defendant's demeanor that indicated the plea was not knowing, intelligent, or voluntary. Defendant understood the elements of obstruction of justice, aggravated

21

arson, and simple arson, as defense counsel had discussed the elements many times. Defendant did not appear to be incapacitated or unable to understand. She "seemed totally lucid and very intelligent and understood everything that was going on in the courtroom." Robideaux testified that Defendant was one of the most aware people that he had ever met. Robideaux admitted Defendant's mood changed "where she was surprised or disappointed when she saw her son and she wanted to talk to him." That was prior to the plea, and Robideaux told Defendant it would be best not to.

On September 13, 2019, defense counsel cross-examined Guilbeau. Guilbeau testified that he explained Defendant's constitutional rights to her prior to her plea, but Defendant did not sign a plea sheet or waiver of rights form. Guilbeau, Robideaux, and Defendant were present in the courtroom at that time. The judge and the State subsequently entered the courtroom, and the judge explained Defendant's constitutional rights to her. Guilbeau testified Defendant knew she had a right to a jury trial. He then noted that he had many conversations with Defendant in the two months prior to trial regarding her son. Guilbeau stated:

> That was an issue that we could not get over on obstruction of justice if her son actually came to court. And she understood that. And every time we had these talks about trying to get into a plea bargain position she'd say, well let's see if he shows up. That would be her position.

It was upsetting to Defendant because it was her son. However, Defendant always knew counsel did not want to go to trial on obstruction of justice if Hall showed up. Hall was subpoenaed, given immunity, and showed up for trial.

Guilbeau reiterated that he explained the plea deal to Defendant, including the dismissal of the aggravated arson charge and the no contest plea to obstruction. He informed Defendant she would receive a suspended sentence "from what the Judge was telling us." Defendant was adamant about not pleading guilty to anything that

would harm Hall, but still had problems pleading to obstruction. That was why the no contest plea made sense to Guilbeau. Guilbeau told Defendant that obstruction was a legitimate charge because she told the fire marshal she was in Lafayette when she was in fact in Alexandria. Guilbeau testified that he told Defendant she was facing up to twenty years prior to the plea entry. Guilbeau was realistically convinced Defendant would receive a suspended sentence.

During the recitation of the factual basis, Guilbeau thought the State should not have mentioned Hall. Guilbeau interrupted and a correction was made, at his request. Guilbeau testified that Defendant indeed lied to the fire marshal. Her defense was that she was not given the opportunity to explain the rest of her story. Guilbeau then testified that what was pointed out to Defendant was if Hall testified against her, "[h]e was going to ruin her emotionally and physically in every way. And so this was an opportunity to get around that and to make a really broken hand into a winning hand and plead no contest which technically could have been obstruction of justice with the fire marshal." Guilbeau said he pointed out to Defendant several times prior to the date of her plea that her statement to the fire marshal was false. According to Guilbeau, there was a DVD showing Defendant was at McDonald's in Alexandria when she reported being in Lafayette, and Defendant knew that. Defendant was informed by the fire marshal that the fire occurred around 5:45 a.m. and was asked if she was in Lafayette. Defendant responded affirmatively and indicated that she went to see patients after she woke up.

Guilbeau testified that when Defendant saw Hall in court, "she was coming apart. She was coming apart because she knew this was, the worse [sic] had happened." Guilbeau was not aware of any burdens on Hall at the time of

23

Defendant's plea. Guilbeau told Defendant before the plea that her son would not have to testify if she entered the plea.

Hall was Defendant's alibi, having indicated that he was with his mother the night of the fire. Hall later gave a statement to LSU police indicating Defendant told him she burned down the house. Defendant was aware of this at the time of her plea. In his statement to LSU police, Hall said he thought his mother set up the beating that occurred in Lafayette after the fire and that he was afraid of Defendant. Defendant was aware of that information prior to her plea. Guilbeau acknowledged that he had informed Defendant that if Hall testified in accordance with the statement he gave to LSU police, she could be convicted of arson. However, Guilbeau never believed Defendant was guilty of aggravated arson.

Guilbeau was questioned about whether La.R.S. 14:130.1 covered giving a false alibi. Guilbeau felt there was evidence of more than one false statement by Defendant as well as evidence of other instances of obstruction in relation to Hall.

Hall's statements to the fire marshal and the LSU police were admitted as State's Exhibit 7, and an affidavit executed by him on April 28, 2014, was admitted as State's Exhibit 8. In his statement to the fire marshal, Hall stated Defendant said she had a conversation with a friend wherein she told the friend she was going to burn the building. The day after the fire, Defendant told Hall she drove to Natchitoches, put gasoline on the back porch, and lit a match. After Defendant had been arrested, she asked Hall to tell an elaborate story to her attorney about her whereabouts at the time of the fire. Hall eventually told Defendant's attorney he did not want to be involved in the matter, and the attorney told Hall he would be subpoenaed. If he did not appear, he would go to jail. Hall reported that he told his mother her attorney wanted to put him in jail, and she replied, "'Of course he does.

24

You're a witness in this case.'" Hall went on to detail the beating he endured on May 13, 2014, and said the perpetrators asked where his mother kept her money. Defendant wanted him to say the attack was linked to the fire, and the men were Natchitoches law enforcement officers who told him not to testify on her behalf. Hall also signed a notarized statement written by his mother. In the affidavit executed on March 31, 2014, Hall said he was with Defendant at the time of the fire.

Dr. Salcedo was accepted as an expert in forensic psychology. Dr. Salcedo was not in court when Defendant pled and was not asked to be present. However, he reviewed the *Boykin* transcript and affidavits from Welborn and Dr. Alexander.[9] Dr. Salcedo first examined Defendant on January 18, 2019. He stated Defendant was very verbal, outspoken, witty, quick minded, assertive to the point of being verbally aggressive at times but pleasant, not shy, and not confused. Defendant was clearly of well above average intelligence. Dr. Salcedo testified that contrasted sharply with what occurred during the *Boykinization*. He got the sense that Defendant was confused during the *Boykinization*, and the process was chaotic. He never got the sense that Defendant agreed that she in fact committed the offense. Dr. Salcedo testified that there were a number of factors that influenced Defendant's decision to plead no contest:

> First and foremost, that being the well-being of her son. Secondly, she has no prior criminal history. She is a medical professional, respected in the community and she's never been through anything like this[,] so she was more overwhelmed than the typical defendant that I see. You know, I mean we evaluate, you know, five, eight people a week and it's just, you know, some of them are frequent flyers. And, you know, this is not the kind of defendant that I'm used to evaluating. And of course[,] competency was never raised or sanity at the time of the offense at any point but she was different in that regard from other defendants and as such perhaps more susceptible to these influences, these undue influences that have to do with concerns about her son and what might

---

[9] There is no information regarding Dr. Alexander in the record.

happen to him. And, you know, the fact that he had been severely beaten, the fact that she had been beaten. You know, there are a number of things that may have impacted her on the day that she entered the nolo contendere plea. Which if she were to do it today her decisions would be completely different without those undue influences.

As noted, he had information regarding Hall being beaten and Defendant trying to protect him and being beaten as well. According to Dr. Salcedo, if Defendant's son had been threatened with a charge, her plea would not have been freely and voluntarily entered.

Although Dr. Salcedo further testified that during the *Boykinization* Defendant did not make complaints about being ill or anxious, he noted there were a number of times when she seemed confused or hesitated, which were represented by the court reporter using "the dot, dot." He then stated that "she's not a dot, dot, dot kind of woman. I think we all know that." Dr. Salcedo indicated there was nothing overt in the transcript that indicated Defendant was upset or not in her right mind. He testified that Defendant pled "guilty to something that she now certainly believes she did not commit." He stated the following regarding Hall: "I think there is mention from the beginning and possibly being indicted as a co-conspirator or, I don't know how that works but as an unindicted co-conspirator. I mean there is this cloud of threat over his legal status that was being discussed." Dr. Salcedo was further questioned:

Q. Okay so in the transcript of the plea she said on page 5, . . . "This would relieve my son of any burdens and my son would be left alone."

A Correct.

Q. Did you think that meant he would not be, that criminal charges which had been brought against him would be voided?

A. Criminal and possibly physical because he had been beaten up.

26

Dr. Salcedo acknowledged that some of his opinion was based on his believing what Defendant told him, and Defendant told him at length about her son being beaten.

Dr. Salcedo was questioned about *State v. Young*, 71 So.3d 565, the case Guilbeau recited as one that Dr. Salcedo previously testified in, regarding the voluntariness of a plea as follows:

Q.     And did you indicate that an individual's . . . .

       . . . .

Q.     "An individual's ability to understand the difference between entering a guilty plea and a not guilty plea is such a basic, simple, fundamental one that it would require either severe mental retardation or severe psychosis to override that."

A.     That's correct.

Q.     All right. So[,] in this case the question was, was Mr. Young psychotic at the time he entered his plea. Was he in a psychotic state?

A.     No, he was not. Because I ended up saying that his plea was voluntarily entered.

       . . . .

A.     Nobody was threatening his daughter though.

       . . . .

A.     I, I could have added other conditions[,] but nobody was threatening his son or his daughter.

It would change the scenario if Defendant was the person threatening her son. Dr. Salcedo was also "somewhat confused" about what the terms of the plea were and if the arson charge was being dismissed. He was also confused about a no contest plea and stated that if he was confused, he could see how other people would be confused. Dr. Salcedo was asked what made him conclude Defendant did not fully understand the consequences of what she was doing and the procedure. He replied, "[T]he

review of the Boykin and her recollection and the affidavits that showed that she was in a significant amount of emotional and even physical distress at the time."

Dr. Salcedo described Defendant's personality style as "not docile" and stated Defendant was "probably not the most popular person at the cocktail parties . . . at the medical lounge."

Dr. Salcedo noted Defendant was asked by the medical board to seek psychiatric care. Defendant was diagnosed with a mood disorder and prescribed a mood stabilizer, which may have been related to gambling. Dr. Salcedo testified that Defendant did not show any evidence of mood instability, and "it didn't seem like the kind of diagnosis that I've seen warranted." He found Defendant to be in touch with reality. He acknowledged that none of what Defendant said sounded overly psychotic, and he did not feel Defendant had been in a psychotic state when she entered her plea. Additionally, there were no complaints of physical distress by Defendant during the plea. Moreover, the only evidence that Defendant was distraught during the entry of her plea were affidavits executed thereafter.

There was a discussion with Dr. Salcedo regarding undue influence and Defendant's statement that her son be left alone. According to Dr. Salcedo, that was why Defendant went along with the plea. Dr. Salcedo was asked, "But if somebody threatens harm to someone you love, how free, how voluntary is any assertion that you make after this?" He responded: "Well obviously not very. Dr. Salcedo was also asked, "So in her communication to her lawyer from that statement she believed that if she didn't do what she did they could've charged her and would've charged her son." He responded: "That's, that's the impression I got."

Dr. Nemeth also testified at the hearing on the motion to withdraw Defendant's plea. Dr. Nemeth first came into contact with Defendant due to court

28

ordered reunification therapy regarding Defendant's son. Dr. Nemeth later treated Defendant because the board of medical examiners thought Defendant had a gambling problem. The facility at which Defendant was treated for gambling diagnosed her with "pathological gambling, major depression recurrent in remission and anxiety disorder," and her physician at that facility asked Dr. Nemeth to resume treating Defendant. Defendant was prescribed Lamictal because the treatment center thought she might be bipolar. However, it was subsequently determined Defendant had a thyroid disorder and was not bipolar. Defendant was treated from December 21, 2011, through January 25, 2015. Defendant participated in group gambling addiction therapy but had trouble with the group. Dr. Nemeth testified that Defendant was not a group-oriented person.

On June 18, 2014, after Defendant and her son were beaten, Defendant was diagnosed with post-traumatic stress disorder (PTSD), but Dr. Nemeth did not record the diagnosis. As a result of her PTSD, Defendant had flashbacks. According to Dr. Nemeth, "[W]atching [her son] walk through a courtroom would trigger something like that." Defendant returned to treatment in 2018 and 2019.

On October 29, 2019, Defendant testified. Defendant stated she was never told that she could receive a potential jail sentence. Guilbeau informed her that she would get probation and a suspended sentence and would not have to pay fines and cost, but he never said the maximum sentence for obstruction of justice was twenty years. She did not become aware that she could be ordered to serve up to twenty years until she began to receive threatening phone calls after her plea.

Defendant additionally alleged that the transcript of the December 18, 2018 conversation admitted into evidence was not the entire conversation she had with Guilbeau. According to her, the first ten to fifteen minutes as well as the end of the

29

conversation were not included. However, she admitted that the content of the submitted transcript was accurate.

Defendant recalled that after she emailed Guilbeau regarding withdrawing her plea, she was summoned to his office. During the conversation on December 18, 2018, Guilbeau told her she was going to receive probation. However, she was not happy with that. Defendant again testified she was never told there was a possibility she could go to jail. Defendant said Guilbeau told her he knew she would not plead if she knew the possible sentence. Moreover, the judge did not tell her the minimum and maximum sentence either.

Defendant testified that Guilbeau had been coercing her for at least six months prior to the plea. He called her and had her summoned into his office for months up to a year. Defendant additionally testified:

> He told me that I was a bad mother for putting my son through this. And that I was being stubborn to keep insisting that I was innocent. He actually told me to lie back in 2016 when I was charged with simple arson. When I was charged with simple arson, he told me just to lie and go along with the prosecutor's version at that time that I owned the house. And I told him but that's not true and he told me just to keep my mouth shut and go along and he would get it kicked out on a technicality because it's not against the law to burn down your own house. And that's how I ended up getting charged with aggravated arson because I told him I don't think that's a really good idea. But then he also coerced me by demanding money that I didn't have out of me.

Defendant further alleged that in July 2018, Guilbeau demanded $250,000 to handle her trial.

Defendant testified she was under duress at the time of her plea because she had not seen her son in several years and she reverted to the image of her son lying in a pool of blood following the May 13, 2014 beating. Regarding the beating, Defendant indicated that on that day, when she arrived home, there were two men who beat her with a baseball bat and told her to keep her mouth shut about what

happened in Natchitoches and to stop asking for a trial. Hall was bound with tape and lying in a pool of blood when she found him. Defendant said, regarding seeing Hall in court on December 10, 2018:

A. I saw my son being led out of the courtroom with the prosecutor. And I saw my son's friend Scott in the courtroom. And he once again reiterated what a horrible mother I was and that they were threatening my son.

Q. What were they threatening your son with at the time to your knowledge?

A. To arrest him, to prosecute him.

Q. Okay. So[,] you got information that if you didn't plea [sic], your son would be arrested and prosecuted?

A. That's the information that I got from his friend.

Q. Okay. Who else did you get that information from or have that discussion with?

A. That's all the information I had.

Defendant asked Guilbeau what was going on with her son, and he did not answer her. According to Defendant, Guilbeau told her: "you need to plead to save your son. Otherwise[,] both you and he are going to be sodomized with broomsticks."

Defendant testified that during the plea colloquy when she asked that her son be relieved of any burdens and be left alone, she meant the burden of testifying, being charged, and out of the legal process.

Defendant asserted that she had one discussion with her attorneys on December 10, 2018, before entering her plea. She recalled it being rushed because the jury was getting antsy. Defendant then acknowledged that, in an affidavit admitted as State's Exhibit 11, she stated she had a meeting with her attorneys on June 22, 2018, regarding a plea and said they pressured her into agreeing to a plea bargain. She further admitted discussing a plea several times. However, she testified

31

defense counsel never told her she could get jail time. Counsel had been pressuring her since at least June 22, 2018. However, it was different on December 10 because of her son, but there was nothing new about pleading to obstruction of justice. Defendant testified she did not see the motion to compel her son's testimony when it was filed on December 10, 2018, and it was not until August 16, 2019, that she saw it. Defendant asserted a discussion of this document was addressed in the missing portion of the December 18 conversation with Guilbeau in his office.

Defendant admitted that she saw Hall's taped statement to the LSU police but thought he would testify differently in court. Defendant had not had any contact with Hall since December 2015 and did not have any contact with him on December 10, 2018. Moreover, on December 10, Hall did not tell Defendant he was being threatened with jail.

Defendant was questioned about why she entered the plea and stated: "I was just in shock and I just, I didn't really care what they did to me I just wanted them to leave my son alone."

Welborn was the last witness to testify regarding Defendant's plea. She was friends with Defendant, and Defendant often stayed at Welborn's residence. She went with Defendant to Guilbeau's office on December 18, 2018. According to Welborn, who overheard Defendant's conversation with Guilbeau, Guilbeau never alluded to a prior discussion of a twenty-year sentence with Defendant. However, Welborn was not present when Defendant met with counsel in June 2018.

Welborn heard a discussion between Defendant and Guilbeau when Hall appeared in court:

I heard Lynn crying and saying my son is here, my son is here, oh my God my son, my baby. And Tommy's like, Lynn it's okay you knew he

32

might show up. And she said no you don't, it's not that Tommy. She said when I look at my baby I just see him in a pool of blood and being beaten. She said I'm not saying that because oh my God I'm worried that he's gonna [sic] hurt me. She's like my God this is the first time I've seen him in a long time. You know, and she was crying and everything. And so they were kind of having a conflict because Tommy thought she was upset because he was here and he might have testimony to hurt her and she was trying to explain to Tommy, Tommy that's my baby. This is the first time I've seen him and it's bringing flashbacks of when I found him in a pool of blood. And she was just crying, you know.

Ultimately, the trial court denied the motion to withdraw plea at the conclusion of the proceedings held on October 29, 2019, finding:

For a guilty plea to be found valid there must be a showing that the defendant was informed of and waived her constitutionally guaranteed rights to trial by jury, right of confrontation, right against compulsory self-incrimination. The guilty plea must be entered knowingly and voluntarily. Now those are the core rights of Boykin. There's been a lot of discussion about that this morning. Whether or not the lack of the Court informing of the minimum and maximum sentence in Boykin does not in and of itself, according to Woods and other cases I'm aware of render the Boykin constitutionally defective. The Court is called upon to look at the totality of the circumstances, not just the four corners of the Boykin. What the accused understood is determined in terms of the entire record and not just certain magic words used by the trial Judge. Everything that appears in the record concerning the offense as well as the trial Judge's opportunity to observe the defendant's appearance, demeanor and responses in court should be considered in determining whether or not a knowing and intelligent waiver of rights occurred. Factors bearing on the validity of this determination include the age, education, experience, background, competency and conduct of the accused as well as the nature, complexity and seriousness of the charge. Do I wish, do I wish I could go back and, and put specific language in the colloquy about zero to twenty? Absolutely. I can't do that. So[,] we have to look then from the totality of the circumstances to determine whether the Court finds as a matter of fact that Dr. Rogers did in fact know the minimum and the maximum sentence. Mr. Guilbeau testified that he and Jason explained that maximum penalty of twenty years the morning of the, of the plea. Now I have a specific recollection and I cannot, I cannot say for 100% sure that Dr. Rogers was in court when this took place, but I do believe that she was. In one of our many pre-trial hearings in the large courtroom, I think it may, it may have been when Madeleine was actually was amending to include the obstruction charge, that I asked Ms. Slaughter-Young which subsection, she told me. I asked her which penalty. She told me the 14:130.1 B (2) zero to twenty. I asked her that because I wanted to

33

know. And I think Dr. Rogers was there. Like I said I can't be absolutely positive. I think she was certainly present for most if not all of the pre-trial proceedings. Also, she is obviously a very intelligent person having completed undergraduate school, med school and a very, very complex residency and was a pediatric neurosurgeon. It boggles, it boggles the mind that Dr. Rogers with her knowledge of the legal system and her access to her disbarred lawyer friend, it boggles the mind that she would not understand or know what the minimum and maximum sentence to the obstruction charge was. I think and I did tell Mr. Guilbeau that I intended to give her probation. I told Mr. Guilbeau I intended to not give her fine[s] and costs. And I'm sure he, he relayed that information. And I still intend to do that because I'm a man of my word. Even though my patien[ce] has been tried severely by the filing of the numerous motions in this case. At any rate I think where the problem really came is when and this was a very unfortunate . . . .

. . . .

. . . . The press release, I have no idea who was behind the press release. I don't think that's correct. But you would have no reason to do that. Because as a part of the, as a part of the plea arrangement the ag arson charge is to be dismissed at sentencing. And there's, there's absolutely no reason to think that that's not gonna [sic] happen. But when this press release comes out with all this scary stuff, I can understand why Dr. Rogers was concerned and perhaps second-guessing what Mr. Guilbeau had told her about the Court's intention with sentence. I understand, I can understand how she would have had that reaction. So, you know, it's just very unfortunate that that press release happened. You know, but it did. The plea arrangement. Let's talk, let's talk about the plea arrangement. Plea arrangement was in my understanding, that the very serious charge of aggravated arson which carried six to twenty with a minimum of two was going to be dismissed at sentenc[ing]. That is a huge benefit, absolutely huge. But the Attorney General could not agree to a probated sentence because they're really not in agreement with it. I understand that. So it couldn't be, Dr. Rogers, an agreed-on sentence. It had to be a sentence left up to the Court in order for the State to agree to it. But as I stated before I did tell your lawyer what you were going to get and when we get to that point I still, still intend, I still intend to do that. Now it still, the plea still has to be freely and voluntarily made and we had, we had a lot of testimony by Dr. Salcedo of course this was all made after, after the fact and I have to rely on my recollection of the occurrences of that morning. And the jury was in place and, I actually asked the State if they were willing to extend this offer, this plea offer to Dr. Rogers one more time and they said yes, they would. So[,] there we are about to go to trial on the ag arson and the obstruction and low and behold who shows up but Greg Hall. And was it upsetting to Dr. Rogers, of course it was. But she knew he was going to have immunity and so the only thing left for him to do is to, is to be there to testify against her. I can

understand why she would not want to put him through that. And that, the fact that he would be in her words left alone, that coupled with the huge benefit of having the ag arson dismissed were two tremendous incentives to support this plea. And I think Dr. Rogers as a, as I said very educated and competent surgeon was, you know, she, she weighed those advantages and disadvantages and she decided to go through with, with the plea that morning. She also was in; she also was in court when we had a rather lengthy preliminary examination in this case. So[,] she was aware of all, she was aware of all the evidence that the State had both as to the ag arson and as to the obstruction. Now was the ag arson the strongest case I've ever seen, no. But have I seen juries convict on much less, yes. The obstruction even though not, all of this not technically stated in the recitation of facts in the plea colloquy, the affidavit that Greg Hall gave to the LSU police . . . .

. . . .

. . . The affidavit . . . given to the LSU police by Greg Hall established beyond any doubt that there had been obstruction of justice. She, she asked Greg to lie about being in the backseat of the car at the McDonald's on the morning after the fire. The evidence of obstruction is, I mean it's, there is a, there's a great body of evidence to support that. So based on all of that and considering all the circumstances of the case I do find that the plea was in fact entered freely and voluntarily and the motion to withdraw the plea is denied.

**Standard of Review:**

The discretion to allow the withdrawal of a guilty plea under La. C. Cr. P. art. 559(A) lies with the trial court and such discretion cannot be disturbed unless an abuse or arbitrary exercise of that discretion is shown. *State v. Martin*, 48,045 (La. App. 2 Cir. 05/15/13), 115 So.3d 750. A defendant has no absolute right to withdraw a guilty plea. *Id.*

Under La. C. Cr. P. art. 556.1, a valid guilty plea must be a voluntary choice by the defendant and not the result of force or threats. La. C. Cr. P. art. 556.1 also provides that prior to accepting a guilty plea, the court must personally inform the defendant of the nature of the charge to which the plea is offered, any mandatory minimum penalty, and the maximum possible penalty. When the record establishes that an accused was informed of and waived his right to a trial by jury, to confront his accusers, and against self-incrimination, the burden shifts to the accused to prove that despite this record, his guilty plea was involuntary. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *State v. Cooper*, 52,408 (La. App. 2 Cir. 11/08/18), 261 So.3d 975; *State v. Martin*, *supra*.

An express and knowing waiver of those rights must appear on the record, and an unequivocal showing of a free and voluntary waiver

35

cannot be presumed. *Boykin*, *supra*; *State v. Johnson*, 51,430 (La. App. 2 Cir. 07/05/17), 224 So.3d 505; *State v. Kennedy*, 42,850 (La. App. 2 Cir. 01/09/08), 974 So.2d 203. A plea of guilty normally waives all non-jurisdictional defects in the proceedings prior to the plea, including insufficiency of the evidence. *State v. Crosby*, 338 So.2d 584 (La. 1976); *State v. Johnson*, *supra*; *State v. Stephan*, 38,612 (La. App. 2 Cir. 08/18/04), 880 So.2d 201. A validly entered guilty plea, or plea of *nolo contendere*, waives any right a defendant might have had to question the merits of the state's case and the factual basis underlying the conviction. *State v. Bourgeois*, 406 So.2d 550 (La. 1981); *State v. Cooper*, *supra*; *State v. Hardy*, 39,233 (La. App. 2 Cir. 01/26/05), 892 So.2d 710.

When ruling on a motion to withdraw a guilty plea, the trial court should look beyond the *Boykinization* and consider all relevant factors. *State v. Griffin*, 535 So.2d 1143 (La. App. 2 Cir. 1988); *State v. Green*, 468 So.2d 1344 (La. App. 1 Cir. 1984); *State v. Banks*, 457 So.2d 1264 (La. App. 1 Cir. 1985). A court, when called upon to ascertain an accused's state of mind, has the power, notwithstanding a record waiver of constitutional rights, to determine whether other factors present at the time of a guilty plea, whether inside or outside the plea colloquy record, were sufficient to render the plea involuntary or unintelligent. *State v. Lewis*, 421 So.2d 224 (La. 1982); *State v. Galliano*, 396 So.2d 1288 (La. 1981); *State v. Griffin*, *supra*.

In order to properly exercise its discretion and in order for the appellate court to review the exercise of that discretion, the trial court should conduct a hearing or inquiry on defendant's motion to withdraw a guilty plea. *State v. Lewis*, *supra*; *State v. Griffin*, *supra*. Reasons supporting withdrawal of the plea would ordinarily include factors bearing on whether the guilty plea was voluntarily and intelligently made, such as breach of a plea bargain, inducement, misleading advice of counsel, strength of the evidence of actual guilt, or the like. A mere change of heart or mind by the defendant as to whether he made a good bargain would not ordinarily support allowing the withdrawal of a bargained guilty plea. *Id.*

*State v. McGarr*, 52,641, 52,642, pp. 10–12 (La.App. 2 Cir. 4/10/19), 268 So.3d

1189, 1196–97.

The benefit a defendant receives from a plea bargain is a relevant factor in the context of a motion to withdraw the plea to determine whether the plea was knowingly and intelligently entered. [*State v.*] *Cook*, [32,110 (La.App. 2 Cir. 6/16/99), 742 So.2d 912]; *State v. Curtis,* 28,309 (La.App.2d Cir.8/21/96), 679 So.2d 512, *writ denied,* 96–2322 (La.2/7/97), 688 So.2d 496.

*State v. Hart*, 50,295, p. 13 (La.App. 2 Cir. 11/18/15), 183 So.3d 597, 605 (footnote omitted).

**Discussion:**

In the second counsel-filed assignment of error, Appellate Counsel contends the trial court erred in accepting Defendant's open-ended plea of no contest to obstruction of justice when there was no factual basis to support the charge, the statute of limitations may have prescribed, she was not informed of the possible penalties, was under extreme duress, and may have been threatened.

In the third counsel-filed assignment of error, Counsel contends the trial court erred in denying Defendant's motion to withdraw her plea as there was compelling evidence that she did not knowingly and intelligently enter a plea of no contest.

In her first pro se assignment of error, Defendant contends the trial court committed legal error when it accepted an involuntary and uninformed no contest plea to obstruction of justice.

In her second pro se assignment of error, Defendant contends the trial court committed legal error when it denied her motion to withdraw her involuntary and uninformed plea.

Defendant's eighth pro se assignment of error contends the trial court committed legal error when it failed to adhere to the statutory requirements for the essential elements of obstruction of justice found in La.R.S. 14:130.1.

In her ninth pro se assignment of error, Defendant contends the trial court committed legal error and violated her substantial rights when it accepted a plea from her when she put the court on notice that she was innocent.

In her twelfth pro se assignment of error, Defendant contends the trial court committed legal error and violated her constitutional rights by accepting a plea obtained in an atmosphere of substantial coercion.

In her fourteenth pro se assignment of error, Defendant contends the trial court committed legal error and violated her substantive rights when it failed to comply with the provisions of La.Code Crim.P. art. 556.1, which requires the trial judge to advise the accused of any potential sentence exposure and the nature of the charges.

Inasmuch as these assignments of error relate to Defendant's plea, the court will address them collectively.

*Extreme Duress, Threats, Knowing and Intelligent Plea*:

Counsel addresses Defendant's allegations regarding duress, stating she "appeared to be under duress." He asserts Defendant only wanted to make sure her son, "a victim and now an alleged co-conspirator, would be left alone." He notes that when asked if any promises had been made to her to get her to plead no contest, Defendant responded, "'That this would relieve my son of any burdens.'" He further states, "She also appears to have been threatened." Proof of this allegation was Defendant's response, "'Not today, no,'" when asked if she had been threatened. He notes the court made no further inquiry as to her remark. Counsel concludes his argument by stating the trial court erred in denying Defendant the opportunity to withdraw her plea despite compelling testimony that her plea was not knowingly and intelligently entered. In Defendant's second pro se assignment of error, she adopts Counsel's arguments.

In her first pro se assignment of error, Defendant alleges she tried to withdraw her plea as soon as she recovered from the effects of her severe PTSD crisis precipitated by the events of December 10, 2018. Defendant further asserts that

38

during the six years her case was pending she was repeatedly denied fundamental rights and subjected to prosecutorial and judicial vindictiveness. Defendant alleges she would not have pled no contest if the State had not threatened to prosecute her son just before trial. Defendant argues the State's claim that it did not threaten to charge Hall is contradicted by the record. She cites to a hearing held on December 5, 2018, at which the State filed a "Notice of Intent to Use Any Written, Recorded, or Oral Statements of Greg Hall as Evidence of a Co-conspirator Statement of the Defendants. Co-conspirator statement . . . as a co-conspirator of the defendant." Defendant notes the State granted "partial immunity" to Hall on December 10, 2018, but suggests that information was not provided to her until well after her plea. Moreover, Guilbeau did not obtain the documents until August 16, 2019. Defendant next attacks Guilbeau's credibility. She alleges Guilbeau filed a sentencing memorandum that contained numerous errors. Guilbeau's statement to her that she would receive a suspended sentence was inaccurate inasmuch as the judge later told her the State did not agree with her receiving probation. Defendant alleges she would not have given up her rights if she had been informed that the State was not in agreement with a suspended sentence. Defendant then asserts her plea was not informed because the record does not support claims by Guilbeau and Robideaux that they informed her that she could be sentenced to twenty years. Moreover, counsel testified truthfully when he stated he did not see a copy of the immunity agreement during the plea and that there would not have been a plea if Defendant had known the judge would switch the factual basis to Hall. Defendant further asserts there were numerous evidentiary and ethical breaches affecting her rights that require de novo review, including the admission of an excerpt of her conversation with Guilbeau on December 18, 2018, instead of the entire conversation. Defendant

addresses the immunity agreement regarding Hall, asserting she was not made aware of the agreement prior to her plea and was never told the State had to compel her son's testimony because he wanted to recant the statements he made on September 11, 2014, while suffering the effects of brain damage. Moreover, the State did not grant Hall full immunity, reserving the right to prosecute him for perjury.

Defendant also makes claims regarding the factual basis for her plea, alleging there was no factual basis for obstruction of justice at the time of her plea, the factual basis was changed by the judge during the hearing on her motion to withdraw her plea, and the media contributed to the confusion by stating Defendant intentionally burned a historic structure. Defendant contends the trial court's December 5, 2018 decision to bar testimony of Drs. Juneau and Nemeth contributed to her duress. Defendant further asserts there are numerous patent errors, including a confusion-filled courtroom with the State amending the bill and filing motions during the plea and inaudible responses by Defendant during the plea. Defendant asserts these patent errors support her claim that her plea was involuntary due to PTSD flashbacks, and these flashbacks were triggered by the State's last-minute threat to prosecute Hall. Defendant further asserts the trial court failed to comply with La.Code Crim.P. art. 556.1 in that it failed to inform her of the potential sentence.

In her twelfth pro se assignment, Defendant contends her plea was obtained in an atmosphere of substantial coercion. Defendant claims that over six years of constitutional deprivations along with the State's last-minute decision to threaten her brain damaged and traumatized son with prosecution just prior to trial created constitutionally prohibited coercion. Defendant points out Dr. Salcedo's comparison of the circumstances to holding a gun to someone's head and Guilbeau's testimony that she was falling apart on December 10, 2018.

40

The State asserts the record clearly shows Defendant was advised of and waived her rights to trial by jury, confrontation, and self-incrimination. Additionally, there was a valid factual basis for her plea. The State argues that Defendant's claims of duress are false and directly contradicted by the record, as the State granted Hall immunity prior to Defendant's plea. Moreover, Hall's testimony would have shown that Defendant obstructed justice by attempting to and actually coercing him to give a false statement to support her theory of the case. The State contends Defendant pled no contest to spare herself from her son's damaging testimony. Citing *State v. Davis*, 31,848 (La.App. 2 Cir. 3/31/99), 731 So.2d 958, the State maintains that a mere change of heart or mind is not sufficient to allow withdrawal of a bargained for plea.

Appellate Counsel references the law applicable to the withdrawal of a plea but does not reference any testimony from the hearing on Defendant's motion to support his arguments that Defendant's plea was unknowingly and unintelligently made. Thus, Counsel's brief does not comply with Uniform Rules—Courts of Appeal, Rule 2-12.4, which provides in part:

Uniform Rules—Courts of Appeal, Rule 2-12.4 provides, in pertinent part:

A. The brief of the appellant shall contain, under appropriate headings and in the order indicated:

. . . .

(7) a statement of facts relevant to the assignments of error and issues for review, with references to the specific page numbers of the record;

(8) a short summary of the argument, i.e., a succinct, clear and accurate statement of the arguments made in the body of the brief;

(9) the argument, which shall contain:

41

(a) appellant's contentions, with reference to the specific page numbers of the record and citations to the authorities on which the appellant relies,

(b) for each assignment of error and issue for review, a concise statement of the applicable standard of review, which may appear in the discussion or under a separate heading placed before the discussion, and

(c) for each assignment of error and issue for review which required an objection or proffer to preserve, a statement that the objection or proffer was made, with reference to the specific page numbers of the record; and

. . . .

B. . . .

. . . .

(3) The court may disregard the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made.

(4) All assignments of error and issues for review must be briefed. The court may consider as abandoned any assignment of error or issue for review which has not been briefed.

Defendant's pro se brief, however, sets forth page references and the names of witnesses at hearings on her motion. Thus, we will address the issues presented by Defendant.

Defendant was informed of and waived her right to trial by jury, to confront her accusers, and against self-incrimination. Thus, Defendant had the burden of proving her guilty plea was involuntary. Defendant suggests her plea was involuntary for various reasons, including duress, threats to prosecute Hall, rushed proceedings, PTSD flashbacks, and coercion by her attorneys.

Defendant testified that during the plea colloquy when she asked that her son be relieved of any burdens and be left alone, she meant the burden of testifying, being charged, and out of the legal process. Defendant further testified that she

would not have pled no contest if the State had not threatened to prosecute her son just before trial. However, on December 10, 2018, Hall did not tell Defendant he was being threatened with jail. According to Defendant, it was Hall's friend Scott that told her there were threats to arrest and prosecute Hall. Scott did not provide an affidavit in support of Defendant's claims and was not called as a witness at the hearings on her motion to withdraw her plea.

The State's notice of intent to use Hall's statement, filed on December 5, 2018, referred to Hall as an unindicted co-conspirator in the charge of obstruction of justice and noted its intent to use his statements at Defendant's trial. The motion to compel Hall's testimony was filed in open court on December 10, 2018, and that motion stated no charges were pending against Hall and that Hall had been given immunity except for prosecution for perjury, giving a false statement, or otherwise failing to comply with the motion to compel. Defendant was present in court at the time the motion to compel was filed. Moreover, when the State set forth the factual basis for Defendant's plea, it specifically stated that Hall had been given immunity for his testimony. The record supports the trial court's finding that Defendant knew Hall was going to have immunity despite Defendant's claims otherwise.

Dr. Salcedo's testimony suggests Defendant's plea was coerced. However, the trial court noted Dr. Salcedo's examination of Defendant occurred after she entered her plea. Additionally, Dr. Salcedo relied on Defendant's accusations that the State was threatening to prosecute Hall, and that allegation is not borne out by the record. Furthermore, the language in Dr. Salcedo's report is not conclusive. Therein, he stated: "Dr. Rogers, **at least according to her**, was threatened with the possibility that her son **might** be indicted as a co-defendant with her, and face similar

43

penalties, if she did not agree to plead nolo contendere. This would **appear to represent** a case of **possible undue influence**[.]" (Emphasis added).

Defendant testified she was under duress at the time of her plea because she had not seen her son in several years and seeing him that day caused PTSD flashbacks. Neither Guilbeau nor Robideaux questioned Defendant's mental state at the time of her plea, and the record does not reveal a medical diagnosis that indicated otherwise. There was no testimony that Defendant's PTSD was so significant that it impaired her ability to enter a plea.

Defendant also alleged she was in a fog at the time she pled. However, it is clear from a reading of the *Boykin* transcript and the details of that date that Defendant pointed out during her conversation with Guilbeau on December 18, 2018, that she was not incoherent during the entry of her plea on December 10. As acknowledged by Dr. Salcedo, there is nothing in the *Boykin* transcript indicating Defendant was not in her right mind. Moreover, during the December 18 conversation, Defendant told Guilbeau she saw an individual she thought was from the fire marshal's office in court with a stack of papers, and the man told her that Guilbeau asked for the documents. She then inquired about the late receipt of those documents. She also questioned Guilbeau about the sidebar conference that occurred during the State's presentation of the factual basis. Defendant noted that Dunahoe shook Guilbeau's hand at the "end of the hearing." Defendant further stated: "what was that written statement that she presented at the hearing. She said she had amended it to say something in its entirety." She also noted her son was with a friend.

Defendant further suggests her attorneys coerced her into pleading guilty. Examples of such coercion include payment of money to handle Defendant's trial

44

and discussions regarding the entry of a plea. According to Guilbeau and Robideaux, there was adequate time to consider the plea on December 10. Additionally, Guilbeau had discussed a plea with Defendant numerous times prior to that date, and Defendant acknowledged there were discussions regarding a plea at least since June 22, 2018.

During her testimony at the hearing on her motion to withdraw, Defendant noted that things were different on December 10, 2018, because of her son, but admitted there was nothing new about pleading to obstruction of justice. Based on the record, it appears Defendant had a change of heart or mind following entry of her plea, which is not a sufficient basis to allow withdrawal of her plea. The trial court considered the totality of the circumstances surrounding Defendant's plea, and we cannot say the trial court abused its discretion in denying Defendant's motion to withdraw that plea. Moreover, Defendant's claims rely on credibility determinations. Questions of credibility are within the discretion of the trier of fact. S*tate v. Harrell*, 607 So.2d 661 (La.App. 3 Cir. 1992). Thus, we find no error in the trial court's denial.

Additionally, Defendant's claims regarding the trial court's decision to prohibit the testimony of Drs. Juneau and Nemeth and ethical breaches regarding Defendant's December 18, 2018 conversation with Guilbeau were not raised in Defendant's motion to withdraw her plea. Thus, these issues are not considered by this court. Uniform Rules—Courts of Appeal, Rule 1-3. Issues regarding the factual basis and the failure of the trial court to inform Defendant of the maximum sentence are addressed separately.

*Lack of Factual Basis for Plea*:

45

In Counsel's Assignment of Error Number Two and Defendant's Pro Se Assignments of Error Numbers 8 and 9, arguments of error are made based on the prosecution's factual basis provided for the plea. In assignment of error number two, Appellate Counsel argues that, due to Defendant's actions, the trial court should have been on notice that a detailed colloquy was needed to develop a sufficient factual basis for her plea. Counsel then alleges the State "seemed to" rely on an affidavit made by Defendant's son in a civil case.

In her eighth pro se assignment, Defendant asserts the trial court unlawfully allowed the State to broaden the definition of obstruction of justice to achieve the trial court's goal of finding something for her to plead to. Defendant suggests there was no evidence of her June 22, 2012 interview with the fire marshal, Chad Parker, at the time she pled. Moreover, the trial court heard the testimony of the fire marshal at a prior hearing, and that testimony did not prove she engaged in any activity that meets the statutory requirements for obstruction of justice. According to Defendant, the trial court cannot apply a "spurious interpretation" of the statute to obtain a conviction in a problematic case.

In her ninth pro se claim, Defendant asserts the trial court violated her rights by accepting her plea when she put the trial court on notice that she was innocent. Defendant raises *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160 (1970), in support of her assertion that strong evidence of guilt in the record is needed for a trial court to accept a plea when a defendant claims actual innocence, which did not exist in this case. Defendant further asserts the trial court was put on notice when she filed the motion to withdraw her plea. Defendant also cites *State v. Linear*, 600 So.2d 113 (La.App. 2 Cir. 1992); *State v. Orozco*, 609 So.2d 1043 (La.App. 2 Cir. 1992); *State v. Powell*, 584 So.2d 1252 (La.App. 2 Cir. 1991); and *State v. Brooks*,

38,963 (La.App. 2 Cir. 9/22/04), 882 So.2d 724, *writ denied*, 04-2634 (La. 2/18/05),

896 So.2d 30, amongst others, in support of her claim.

First, we note that a no contest plea and an *Alford* plea are not the same under

Louisiana law:

> Louisiana law does not recognize a no contest/*Alford* plea. Indeed, the two pleas are contradictory. "A plea of nolo contendere is equivalent to an admission of guilt," whereas a defendant professes his innocence in an *Alford* plea. *State v. Villarreal*, 99-827, p. 4 (La.App. 5 Cir. 2/16/00), 759 So.2d 126, 129, *writ denied*, 00-1175 (La. 3/16/01), 786 So.2d 745.

*State v. Anderson*, 16-588, p. 11 (La.App. 3 Cir. 3/1/17), 214 So.3d 979, 986, *writ*

*denied*, 17-864 (La. 1/29/18), 233 So.3d 609. Unlike an *Alford* plea, a "significant

factual basis" is only necessary for a no contest plea under certain circumstances:

> Generally, a defendant waives the right to question the merits of the State's case or the underlying factual basis by entering a plea of guilt, or plea of *nolo contendere*. *State v. Brooks*, 38,963 (La.App. 2 Cir. 9/22/04), 882 So.2d 724. "When a guilty plea is otherwise voluntary, there is no necessity to ascertain a factual basis for that plea unless the accused protests his innocence or for some other reason the trial court is put on notice that there is a need for such an inquiry. In that event, due process requires a judicial finding of a *significant factual basis* for the defendant's plea." *State v. Linear*, 600 So.2d 113, 115 (La.App. 2 Cir.1992); *See North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). However, this court has held that a plea of *nolo contendre* [sic] alone, unlike a guilty plea accompanied by a claim of innocence, does not put the trial court on notice that a significant factual basis must be obtained. *State v. Villarreal*, 99-827 (La.App. 5 Cir. 2/16/00), 759 So.2d 126, *writ denied*, 00-1175 (La.3/16/01), 786 So.2d 745; *State v. Guffey*, 94-797 (La.App. 3 Cir. 2/1/95), 649 So.2d 1169, *writ denied*, 95-973 (La.9/22/95), 660 So.2d 469.

*State v. Johnson*, 04-1266, pp. 6–7 (La.App. 3 Cir. 2/2/05), 893 So.2d 945, 950.

In *Linear*, 600 So.2d 113, defendant specifically entered an *Alford* plea to

attempted second degree murder, and the state set forth a factual basis for that plea.

The trial court asked the defendant if the facts were correct, and defendant said they

were not. He gave his version of the events and noted he did not intend to kill the

47

victim and acted in self-defense. On appeal, the court noted the defendant's self-defense claim and denial of specific intent to kill placed the trial court on notice that a judicial finding of a significant factual basis was required. However, the second circuit did not vacate the defendant's conviction but remanded the matter for an additional *Boykin* hearing to ascertain whether there was a significant factual basis for the plea and whether the plea was free and voluntary.

In *Orozco*, 609 So.2d 1043, the second circuit concluded the trial court was placed on notice that the Spanish-speaking defendant lacked an intelligent understanding of the charge against him inasmuch as he was a passenger in a car in which cocaine was found in the trunk and was confused as to whether he was charged with selling, using, or possessing cocaine. The defendant not only denied essential elements of the offense, but the record was "woefully short of establishing a significant factual basis that the defendant was guilty of attempted possession of cocaine." *Id*. at 1046. The case was remanded for an additional *Boykin* hearing.

In *Powell*, 584 So.2d 1252, the second circuit set aside the defendant's guilty plea because he denied committing the offense.

In *Brooks*, 882 So.2d 724, the court affirmed the defendant's conviction for possession of stolen things, noting defendant did not enter an *Alford* plea, the factual basis provided was not so deficient as to put the trial court on notice of the defendant's actual innocence, defendant agreed with the factual basis given, and no contemporaneous objection was made.

At the hearing on Defendant's motion to withdraw, counsel for Defendant declared she entered a best interest plea. However, Defendant did not enter an *Alford* plea. Defendant clearly entered a plea of no contest to obstruction of justice, and the State set forth a factual basis for that plea at the time it was entered. By entering her

plea, Defendant waived her right to question the merits of the State's case and the factual basis presented by the State. Additionally, Defendant does not pinpoint any specific acts or statements by her during the plea colloquy that should have alerted the judge that a significant factual basis was necessary or that she was innocent. Therefore, this case is distinguishable from *Linear*, *Orozco*, and *Powell*.

Appellate Counsel additionally argues that the State "seemed to" rely on an affidavit made by Defendant's son in a civil case. As far as the affidavit, Counsel does not provide any record reference to the affidavit mentioned in his argument on assignment of error number two, any ruling prohibiting use of the affidavit in Defendant's criminal matter, or the content of the affidavit. Thus, his brief fails to comply with Uniform Rules—Courts of Appeal, Rule 2-12.4, and the issue is not considered. *Cf. State v. Blade*, 20-172, 20-173 (La.App. 3 Cir. 4/28/21) (unpublished opinion), *writ denied*, 21-754 (La. 10/1/21), 324 So.3d 1059.

For these reasons, the assignments of error regarding the factual basis for Defendant's plea lack merit.

*Obstruction of Justice Statute of Limitations*:

In Counsel's second assignment of error, he asserts the trial court erred in accepting Defendant's plea when the statute of limitations may have prescribed. Counsel does not reference the filing of any motion regarding the statute of limitations or a ruling by the trial court thereon. He also fails to address the applicable law and relevant jurisprudence in the discussion of this issue. Counsel's brief does not comply with Uniform Rules—Courts of Appeal, Rule 2-12.4. Therefore, this issue is not considered. *Cf. Blade*, 20-172.

*Notification of Maximum Sentence*:

49

In Counsel's second assignment of error, he alleges the trial court failed to inform Defendant of the maximum sentence during her plea as required by La.Code Crim.P. art. 556.1. Counsel suggests the trial court admitted it did not inform Defendant of the minimum and maximum sentences that could be imposed, quoting from the denial of Defendant's motion to withdraw her plea as follows: "'it boggles the mind that Dr. Rogers with her knowledge of the legal system . . . that she would not understand what the minimum and maximum sentence to the obstruction charge was.'" Counsel asserts the trial court noted it had informed Guilbeau, Defendant's attorney at the time she entered her plea, that it intended to impose a probated sentence and assumed Guilbeau relayed this to Defendant. Attorneys Guilbeau and Robideaux also testified they informed Defendant on the day of the plea of the potential sentencing range. However, Counsel argues that nowhere in the tape recordings of December 18, 2018, submitted by Guilbeau, did Guilbeau mention the possible sentencing range.

In her fourteenth pro se error, Defendant additionally argues that the trial court's failure to follow the guidelines of La.Code Crim.P. art. 556.1 was compounded by its failure to utilize a plea form. Furthermore, she argues the State's contention that this judicial obligation can be abdicated to defense counsel is legally unsound.

In response, the State asserts that, although it appears the trial court did not specifically go over the sentencing range with Defendant, Defendant acknowledged that defense counsel had informed her of the sentencing range and told her she would receive a suspended sentence. Moreover, the sentence Defendant received was precisely what she was informed she would be given.

At the time Defendant entered her plea, La.Code Crim.P. art. 556.1 provided:

A. In a felony case, the court shall not accept a plea of guilty or nolo contendere without first addressing the defendant personally in open court and informing him of, and determining that he understands, all of the following:

(1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law.

. . . .

E. Any variance from the procedures required by this Article which does not affect substantial rights of the accused shall not invalidate the plea.

Violations of La.Code Crim.P. art. 556.1 are subject to a harmless error analysis. *State v. Guzman*, 99-1528, 99-1753, p. 12 (La. 5/16/00), 769 So.2d 1158, 1165–66. The *Guzman* court adopted the harmless error analysis set forth in *United States v. Johnson*, 1 F.3d 296, 302 (5th Cir.1993) (en banc) (alterations in original):[10]

To determine whether a Rule 11 error is harmless (i.e., whether the error affects substantial rights), we focus on whether the defendant's knowledge and comprehension of the full and correct information would have been likely to affect his willingness to plead guilty. Stated another way, we "examine the facts and circumstances of the . . . case to see if the district court's flawed compliance with . . . Rule 11 . . . may reasonably be viewed as having been a material factor affecting [defendant]'s decision to plead guilty."

During the dates set forth in the bill of information, obstruction of justice was punishable by not more than twenty years at hard labor. La.R.S. 14:130.1(B)(2). The trial court did not inform Defendant of the sentencing range for obstruction of justice at the time she entered her plea, which is a violation of La.Code Crim.P. art. 556.1. Defendant noted in the affidavit accompanying her motion to withdraw that the State was threatening her with a long prison sentence. Guilbeau testified that he informed Defendant of the maximum sentence on December 10, 2018, before

---

[10] Rule 11 of the Federal Rules of Criminal Procedure is referenced in this quote.

51

Defendant entered her plea. Guilbeau and Robideaux testified they told Defendant that the judge said he would impose a suspended sentence, and that is what the trial court subsequently imposed. Neither Defendant nor Appellate Counsel suggests that Defendant would not have pled guilty had the trial court informed her of the maximum sentence for obstruction of justice. Moreover, the dismissed charge of aggravated arson was punishable by imprisonment at hard labor for not less than six nor more than twenty years, with two years to be served without benefit of parole, probation, or suspension of sentence. La.R.S. 14:51. That charge was dismissed at sentencing. For these reasons, we conclude that the trial court's failure to comply with La.Code Crim.P. art. 556.1 was harmless.

**ASSIGNMENT OF ERROR NUMBER I & PRO SE ASSIGNMENT OF ERROR NUMBER 13:**

In the first counsel-filed assignment of error, Counsel contends the trial court erred in ignoring its own orders by turning its microphone off and/or failing to have all bench conferences and other proceedings recorded, thereby depriving Defendant of her constitutional right to a complete record on appeal. Similarly, Defendant's thirteenth pro se assignment of error contends that the trial court committed legal error when it violated its own March 2018 order to record all sidebars.

Defense counsel filed motions on March 14, 2014, and February 14, 2018, to have proceedings recorded, including "all of the proceeding, including an examination of prospective jurors, the testimony of witnesses, statements, rulings, order and charges by the Court, and objections, questions, statements and arguments of counsel." The 2018 motion was granted, and the April 13, 2018 Order stated, "9. **Motion for Recording of the Proceedings** is granted including any sidebar

52

discussions[.]"  Defendant also asserts a motion was filed on March 18, 2019, but no motion with this date is in the appellate record.

Defendant filed a pro se "Motion for Recording of Proceedings" on September 12, 2019, requesting that all proceedings scheduled on September 13, 2019 and any subsequent proceedings, including "the testimony of all witnesses, statements, rulings, orders, objections, questions, statements, arguments of counsel, and any additional charges that the prosecution might decide to amend at the last minute" be recorded.  The trial court granted the motion on August 16, 2019.[11]

The State asserts Defendant waived review of these claims when she entered an unconditional plea of no contest as this claim involves a non-jurisdictional defect or is otherwise irrelevant.  In support of its assertion, the State cites *State v. Johnson*, 19-2004 (La. 12/11/20), 314 So.3d 806.  Therein, the supreme court addressed the consequences of entering a plea:

> "The general rule is that a guilty plea waives all nonjurisdictional defects in the proceedings prior to the plea and precludes review thereof either by appeal or by post-conviction remedy." *State v. McKinney*, 406 So.2d 160, 161 (La. 1981), citing *State v. Torres*, 281 So.2d 451 (La. 1973) and *State v. Foster*, 263 La. 956, 269 So.2d 827 (1972). However, a defendant may plead guilty while expressly reserving the right to seek appellate review of an error the defendant believes "made useless any continued trial of their defense." *State v. Crosby*, 338 So.2d 584, 586–587 (La. 1976). Defendant here pleaded guilty unconditionally and did not expressly reserve his right to seek appellate review of the denial of counsel's motion to withdraw. We do not believe defendant's subsequent motion to withdraw his plea can transform his unconditional guilty plea into a guilty plea expressly conditioned on his right to seek appellate review of a claimed error. Accordingly, appellate review should have been confined to the question of whether the plea was voluntarily and intelligently entered, or should have been permitted to be withdrawn as involuntarily and unknowingly made (in addition to any jurisdictional defects that appear on the face of the pleadings and proceedings). *See State v. Spain*, 329 So.2d 178 (La. 1976); *State v. Knighten*, 320 So.2d 184 (La. 1975); *see also Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973) ("[An

---

[11] The Order signed by the trial court precedes the file date of Defendant's motion.

unconditional] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea . . . .").

*Id.* at 808–09 (alterations in original).

Defendant asserts much of the discussion during the entry of her plea on December 10, 2018, occurred off the record, despite the trial court's orders. According to her, this legal error was repeated at proceedings occurring on August 16, 2019, September 13, 2019, and October 29, 2019. Defendant entered her plea on December 10, 2018, and all proceedings referenced by Defendant in her pro se brief occurred on or after that date. Accordingly, Defendant's assigned error was not waived by the entry of her plea, and we will review these assignments of error.

Appellate Counsel asserts that failure to record sidebar discussions when Defendant is seeking to withdraw her plea requires reversal of her conviction irrespective of the fact that the omissions may be inconsequential. Counsel further asserts, "[a]s appellate counsel was not trial counsel, he and Dr. Rogers would be placed at a disadvantage trying to prove the trial court in [sic] denying her motion to withdraw her plea." In support of his argument, Appellate Counsel cites *State v. Ford*, 338 So.2d 107 (La.1976), wherein the supreme court reversed a defendant's conviction and remanded for retrial where Appellate Counsel did not serve as trial counsel and the court reporter failed to record the testimony of the state's four witnesses, voir dire, and the state's opening remarks. Counsel also discussed the reversal of convictions based on incomplete records in *State v. Jones*, 351 So.2d 1194 (La.1977), which involved the failure to record a portion of the hearing on a motion for change of venue; *State v. Parker*, 361 So.2d 226 (La.1978), concerning

the lack of a transcript of closing arguments when one of the defendant's assignments of error pertained to the state's closing argument; and *State v. Murphy*, 13-509 (La.App. 5 Cir. 12/19/13), 131 So.3d 1013, addressing an incomplete transcript of the hearing on the defendant's motion to suppress due to the malfunctioning of the court reporter's equipment despite failure to raise a claim challenging the ruling on the motion suppress. He also mentions *State v. Landry*, 97-499 (La. 6/29/99), 751 So.2d 214, in which the supreme court found the appellate record of the capital offense so deficient that the court could not properly review the case for error due to a combination of excessive construction noise and the absence of adequate safeguards for the recordation of the trial proceedings.

Appellate Counsel points out that despite the trial court's order that sidebar discussions be recorded, a sidebar occurred during the plea proceeding when the parties were having trouble with the factual basis for obstruction of justice, and according to Counsel, the issue of whether the prescriptive period for obstruction of justice had passed was discussed at that time.

Additionally, Counsel notes that this court ordered the district court clerk to supplement the appellate record with recordings of any bench conferences that had not been transcribed. While a supplemental record was prepared, Counsel points to the page numbers for bench conferences held in this matter and alleges that the failure of the court reporter to transcribe the bench conferences, "whether inaudible or not, whether the trial court turned off the bench microphone or not, caused sever[e] prejudice[.]" Moreover, this case involved a motion to withdraw a plea of no contest, thus all bench conferences related to the motion should have been transcribed as ordered. Appellate Counsel contends Defendant was denied her constitutional right to appeal and effective assistance of counsel on appeal due to the

incomplete record. In the interest of justice, Counsel prays that this court reverse Defendant's conviction and enter an acquittal in lieu of allowing her to withdraw her plea because this matter has gone on for years. Additionally, Defendant, pro se, asserts she was prejudiced because she did not have access to "this information" that occurred during the bench conferences.

In addressing the merits of Defendant's claims, the State notes that the supreme court has never articulated a per se rule requiring the recording of bench conferences but conducts a case-specific inquiry to determine whether failure to record the conferences results in actual prejudice to the defendant's appeal. The State alleges Defendant failed to identify any specific action, ruling, or other evidence that has been omitted from the record and has merely asserted in conclusory terms that she was prejudiced by the omission of bench conferences without identifying any specific details as to how or why she was prejudiced.

> Louisiana Constitution Article 1, § 19 ensures a defendant's "right of judicial review based upon a complete record of all evidence upon which the judgment is based." *See also* La.Code Crim.P. art. 843 (which provides, in part, that "[i]n felony cases, . . . the clerk or court stenographer shall record all of the proceedings. . . ."). However, the Supreme Court of Louisiana has explained that a defendant is not entitled to relief on the basis of an incomplete record "absent a showing that he was prejudiced by the missing portions of the record." *State v. Draughn*, 05–1825, p. 63 (La.1/17/07), 950 So.2d 583, 625, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). Further, slight inaccuracies in the record or inconsequential omissions which are immaterial to a proper determination on appeal are not cause for the reversal of a defendant's conviction. *Id.* Rather, even an incomplete record may be adequate for appellate review. *Id.*

*State v. Duraso*, 12-1463, 12-1465, pp. 11–12 (La.App. 3 Cir. 12/11/13), 127 So.3d 1015, 1023, *writ denied*, 14-50, 14-74 (La. 6/20/14), 141 So.3d 286.

> This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843 . . . . The Court has instead conducted a case-specific inquiry to determine whether the failure to record the conferences

results in actual prejudice to the defendant's appeal. As a general rule, the failure of the record to reflect the argument of counsel on objections, even when made in open court, does not affect a defendant's appeal because it does not hinder adequate review of the trial court's ruling. *State v. Johnson*, 438 So.2d 1091, 1104 (La.1983). Thus, the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant. *See, e.g., Hoffman*, 98-3118 at 50-51, 768 So.2d at 587 (trial court cured any record problems "by summarizing substantive unrecorded conferences for the record"); *State v. Castleberry*, 98-1388, pp. 28-29 (La.4/13/99), 758 So.2d 749, 773 (three unrecorded bench conferences during direct examination of state witnesses had no discernible impact on the proceedings and the fourth concerned a mistrial motion by defense counsel, the basis of which was "easily ascertainable from the record" without regard to the unrecorded side-bar discussion); *State v. Deruise*, 98-0541, pp. 9-15 (La.4/3/01), 802 So.2d 1224, 1233-37 (failure to record bench conferences in which the prosecutor and defense counsel made their peremptory and cause challenges did not prejudice the appeal when the jury strike sheet was available for review and detailed the exercise of peremptory challenges by both sides and when the transcript of the voir dire revealed a substantial basis for denying a defense cause to the juror, even assuming that the challenge had been made but not preserved in the record; remaining unrecorded bench conferences involved evidentiary matters that were otherwise addressed in the appeal, or involved matters of no discernible impact for which the defendant failed to demonstrate prejudice); *State v. Allen*, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722 (failure to record arguments at the bench concerning some of the defense peremptory challenges harmless when challenges for cause and arguments on the challenges were fully transcribed in the record and the minutes clearly reflected which jurors had been excused peremptorily and whether the state or defense had exercised the challenge).

*State v. Pinion*, 06-2346, pp. 7–8 (La. 10/26/07), 968 So.2d 131, 134–35.

On review, we find that Counsel's contention that Defendant's conviction should be reversed, regardless of whether the omissions at issue may be inconsequential, is contrary to jurisprudence. Based on the above, Defendant must show actual prejudice before her conviction can be vacated.

The fourth circuit addressed claims of prejudice due to an incomplete appellate record in *State v. Wells*, 11-744, pp. 31–32 (La.App. 4 Cir. 4/13/16), 191

So.3d 1127, 1148–49, *writ denied*, 16-918 (La. 4/24/17), 219 So.3d 1097 (alteration in original):

> Appellate counsel requested the transcriptions of numerous bench conferences and hearings. During a post-trial hearing, appellate counsel emphasized the need for transcriptions of discussions related to discovery and/or *Brady* material. Notably, the record contains the transcripts of four previously unrecorded hearings or bench conferences, all related to discovery or *Brady* and none of them are pertinent to the claims herein. Mr. Wells cannot now claim that the record on appeal is inadequate after receiving the transcripts he requested. The fact that he did not receive every single transcript does not entitle him to relief, as "an incomplete record may nonetheless be adequate for appellate review." *State v. Castleberry*, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773. Moreover, Mr. Wells has not demonstrated any prejudice based on the missing transcripts, nor has he specified, beyond mere conjecture, why they are essential to his appeal. *See State v. Pinion*, 06-2346, pp. 7-8 (La.10/26/07), 968 So.2d 131, 134 ("[T]he failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant.") (citing cases).

The fourth circuit reaffirmed its position in *State v. Varnado*, 19-330, pp. 26–27 (La.App. 4 Cir. 1/29/20), ___ So.3d ___, ___, *writ granted on other grounds*, 20-356 (La. 6/3/20), 296 So.3d 1051 (footnote omitted):

> [A] defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. *State v. Alridge*, 17-0231, p. 47 (La. App. 4 Cir. 5/23/18), 249 So.3d 260, 292, *writ denied*, 18-1046 (La. 1/8/19), 259 So.3d 1021; *State v. Castleberry*, 98-1388, p. 29 (La. 4/13/99), 758 So.2d 749, 773. . . . To the extent some are missing, Defendant has made no showing of prejudice as a result. Instead, Defendant broadly proclaimed that "violations of major magnitude" exist. Such a proclamation is insufficient to satisfy the prejudice requirement.

In the current case, Counsel referenced pages which included proceedings held on December 10, 2018, August 16, 2019, September 13, 2019, and October 29, 2019. Counsel did not reference these dates in addressing this assignment of error, but Defendant did in her pro se brief.

After reviewing the pages referenced by Defendant, we note that the transcript of a bench conference held on December 10, 2018, states: "(Counsel approaches the bench. The Court, nor the attorneys are near a microphone, voices are inaudibly speaking.)" Similar language was used in the transcript of August 16, 2019. The September 13, 2019, transcript provides: "(At this time counsel approached the bench. The Court turned off the bench microphone, unable to transcribe)." The record also indicates that other bench conferences occurring on September 13, 2019, were inaudible because the parties were not near a microphone. A conference held on October 29, 2019, was also inaudible due to the distance of the parties from a microphone.

Counsel noted this case involved a motion to withdraw a plea of no contest and that one of the unrecorded bench conferences occurred when the parties were having trouble with the factual basis for the obstruction of justice charge and the prescriptive period for the charge. However, neither he nor Defendant specifically address what motions or other issues were addressed at the proceedings held on the referenced record pages and dates or precisely how Defendant was prejudiced by the lack of transcribed bench conferences. Instead, Counsel made a broad proclamation that "Dr. Rogers' [sic] was denied her constitutional right to appeal and effective assistance of counsel on appeal by the incomplete record [sic]."

After review and consideration of our prior discussions and rulings in this opinion, we find that Defendant has neither sufficiently alleged nor proven she was prejudiced by the errors alleged in these assignments of error. These assignments of error have no merit.

**ASSIGNMENT OF ERROR NUMBER IV:**

In the fourth counsel-filed assignment of error, Counsel contends the State vitiated the plea agreement when a pending arson charge mysteriously appeared on the website of the Clerk of Court for the Tenth Judicial District Court over eight months after the arson charge had been dismissed on October 29, 2019. Although the State asserts this issue was waived by Defendant's plea entry, this issue occurred after Defendant entered her plea and would not be considered a pre-plea defect. Thus, we will address the merits.

"A plea bargain is a contract between the state and one accused of a crime." *State v. Nall*, 379 So.2d 731, 733 (La.1980).

> When a defendant enters into such a plea agreement (or agreement not to prosecute) with the government, the government takes on certain obligations. See **Puckett v. United States**, 556 U.S. 129, 137, 129 S.Ct. 1423, 1430, 173 L.Ed.2d 266 (2009). If those obligations are not met, the defendant is entitled to seek a remedy, which might in some cases be rescission of the agreement and in others specific performance (i.e., requiring the government to fully comply with the agreement). See **Id.**; **Santobello v. N.Y.**, 404 U.S. at 263, 92 S.Ct. at 499. See also **State v. Louis**, 94–0761 at p. 11, 645 So.2d at 1150[.]

*State v. Karey*, 16-377, pp. 18–19 (La. 6/29/17), 232 So.3d 1186, 1198–99.

As noted by Defendant, the aggravated arson charge was dismissed by the State on October 29, 2019. Thereafter, a simple arson charge appeared on the public website of the Clerk of Court for the Tenth Judicial District Court. She argues that relisting the charge, even by mistake, caused her harm and vitiates the plea agreement.[12] Thus, she should be allowed to withdraw her plea. The State proclaims

---

[12] Defendant alleges this harmed her chances of obtaining housing and employment. She further contends that the media depicted her as an arsonist despite her plea to obstruction of justice and the agreement to dismiss the arson charge.

Defendant fails to show how it had any involvement in any possible mistake by the trial court clerk's office.

Defendant asked that the appellate record be supplemented with correspondence showing the State filed arson charges against her during the pendency of her appeal. Thereafter, this court received letters and affidavits Defendant filed in the district court record regarding a July 15, 2020 entry that indicated she had been charged with simple arson. This court asked the Natchitoches Parish Clerk of Court's Office to explain the presence and subsequent removal of the entry from its website. In response to orders issued by this court on May 27, 2021, August 11, 2021, and October 13, 2021, an amended affidavit was submitted to this court, and reads:

> BEFORE ME, the undersigned authority, personally came and appeared AMY VERCHER, who, being first duly sworn, did depose and say:
>
> That she is a Deputy Clerk in and for the Tenth Judicial District Court, Natchitoches Parish, Louisiana charged with preparing appeal records for lodging.
>
> An entry was inadvertently made on July 15, 2020. We checked our records and could not find any reason for the simple arson charge to be there.
>
> Once it was brought to our attention, the record was corrected because there was no filing in her records for that date.

On review, we find that the State did not vitiate the plea agreement inasmuch as the arson charge was dismissed on the record and there was no filing by the State initiating the clerk's entry. Defendant's fourth assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER V & PRO SE ASSIGNMENT OF ERROR NUMBER 3:**

In the fifth counsel-filed assignment of error, Counsel contends a former judge in this case should have self-recused prior to denying Defendant's motions to quash

61

and motion to dismiss, instead of waiting two years to recuse based on appearances of impropriety she knew and/or should have known existed when she accepted the case and had it transferred to her division.

In her third pro se assignment of error, Defendant contends the trial court committed legal error when it violated her constitutional right to an unbiased judge.

Judge Desirée Dyess accepted Defendant's case on January 12, 2016, after Judge Lala Sylvester recused. On January 8, 2018, defense counsel orally moved for Judge Dyess' recusal, stating Judge Dyess received political donations from the Dunahoes and the judge sat on a board with Mrs. Dunahoe, a victim in the case. Judge Dyess noted both she and her opponent had received campaign donations from the Dunahoe[13] law firm, and she did in fact sit on the Northwestern Foundation Board but had not been to many meetings due to her court schedule and had participated by phone. However, she noted she wanted to avoid all appearances of impropriety; therefore, she recused herself from the case. A "Joint Order of Recusal" was signed by both Judge Dyess and Judge Sylvester on January 8, 2018.

Appellate Counsel alleges Judge Dyess had all the information necessary to recuse herself prior to making her first ruling in this case. Thus, he asks this court to vacate the trial court's orders denying Defendant's Motions to Quash and Motion to Dismiss and enter an acquittal. In her pro se brief, Defendant contends that Judge Dyess' failure to recuse herself was such an egregious violation that any objection would have caused further harm. Furthermore, "[i]t would be for this court to remand [her] case since La. Supreme Court Chief Justice J. Weimer believed that [her] case should been [sic] dismissed a year prior to Judge Dyess' delayed

---

[13] This last name is spelled Dunahoe and Donahoe in the record. The spelling used was found on the Louisiana State Bar Association website.

recusal."[14] Defendant argues this error severely prejudiced her and caused years of delay that contributed to her duress. That duress created undue pressure for her to enter a plea. "If an impartial judge had reviewed [her] motions for dismissal there is a high likelihood that this case would have been dismissed and [she] would be practicing neurosurgery in her community[.]" In their discussion of these assignments of error, neither Appellate Counsel nor Defendant set forth the date on which the referenced motions were filed, the date of the rulings thereon, or the page numbers on which that information can be found.

The State asserts Defendant waived review of this issue. Alternatively, it argues Defendant has not declared that she preserved this argument for appellate review with timely objections as to the judge's involvement at the time of these rulings, does not assert that she re-urged these motions to the subsequently appointed ad hoc judge who presided over the pretrial and plea proceedings, and fails to show she reserved her right to seek appellate review of this issue when she entered her plea of no contest. Furthermore, Defendant does not address the merits or substance of the motions she alleges were ruled upon improperly by Judge Dyess.

In *State v. Sede*, 08-547 (La.App. 5 Cir. 2/10/09), 8 So.3d 702, *writ denied*, 09-1023 (La. 3/5/10), 28 So.3d 1006, the trial judge, prior to her election, represented the defendant at his arraignment on two counts of first degree murder. After her election, she accepted the defendant's guilty pleas and sentenced him according to his plea agreement. The defendant did not file a motion to recuse or otherwise preserve the issue of recusal for appeal. He argued the judge should have

---

[14] In *State v. Rogers*, 17-6 (La. 2/10/17), 216 So.3d 47, the supreme court denied Defendant's writ application. However, the opinion stated, "WEIMER, J., would grant." In that case, Defendant sought review of this court's ruling in *State v. Rogers*, 16-878 (La.App. 3 Cir. 12/1/16) (unpublished opinion), wherein this court found no error in the trial court's denial of Defendant's motion to quash and supplemental motion to quash.

recused herself on her own motion. The fifth circuit determined the trial judge's "failure to recuse is not a jurisdictional defect, and, as such, is waived by an unconditional guilty plea." *Id.* at 705. Thus, the defendant was precluded from raising the issue on appeal.

Defendant herein entered an unqualified no contest plea. Consequently, she waived any issue regarding Judge Dyess' recusal and her prior rulings.

## ASSIGNMENT OF ERROR NUMBER VI & PRO SE ASSIGNMENT OF ERROR NUMBER 18:

In the sixth counsel-filed assignment of error, Counsel contends:

The State and trial court were both vindictive when Dr. Rogers asserted her constitutional right to trial by jury. The State in amending the Bill of Information to aggravated arson after four years, based on the same set of facts. The court, in seeking sua sponte to revoke Dr. Rogers' probation despite the recommendation of Probation and Parole she be released.

In her eighteenth pro se assignment of error, Defendant contends the trial court engaged in judicial vindictiveness that violated her rights.

**Amended of Bill of Information:**

Appellate Counsel alleges the State was vindictive when it amended Defendant's charge to aggravated arson after Defendant asserted her constitutional right to trial by jury. He argues the State's act in amending the bill of information four years after institution of prosecution to charge Defendant with aggravated arson, which was based on the same set of facts as the original bill, constituted vindictiveness.[15]

The State asserts Defendant waived this issue when she entered an unqualified no contest plea. Moreover, she failed to show she raised the issue in the trial court.

---

[15] The amended bill of information was filed into the record on December 27, 2017.

However, according to Counsel, this issue is reviewable because an unqualified guilty plea does not waive claims of vindictive prosecution that are evident from the face of the indictment.

In support of this assertion, Counsel cites *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098 (1974). Therein, Perry was convicted of assault in an inferior court having exclusive jurisdiction for the trial of misdemeanors. The court imposed a six-month sentence. Under North Carolina law, Perry had an absolute right to a trial de novo in the Superior Court, which possessed felony jurisdiction. After Perry filed his notice of appeal, the prosecutor obtained a felony indictment charging Perry with assault with intent to kill. Perry pled guilty to the felony and was sentenced to a term of five to seven years in prison. Perry alleged the subsequent felony charge deprived him of due process. The Supreme Court found that even though a guilty plea precludes claims relating to the deprivation of constitutionally protected pretrial rights, those limitations do not apply when the issue concerns the power of the state to hale a defendant into court.

In *State v. Gioele*, 17-72, p. 1 (La.App. 1 Cir. 3/20/17) (unpublished opinion), the first circuit stated:

> [A] valid, unqualified plea of guilty waives all nonjurisdictional defects in the proceedings prior to the plea except due process claims for vindictive prosecution and double jeopardy claims that are evident from the face of the indictment. See Blackledge v. Perry, 417 U.S. 21, 30–31, 94 S.Ct. 2098, 2104, 40 L.Ed.2d 628 (1974).

In *State v. Darensbourg*, 06-572, p. 3 (La.App. 5 Cir. 12/27/06), 948 So.2d 1128, 1131–32, *writ denied*, 07-317 (La. 11/9/07), 967 So.2d 495, the fifth circuit reviewed a claim of prosecutorial vindictiveness, stating:

> Generally, a new issue, that has not been submitted to the trial court for a decision, cannot be raised for the first time on appeal. *State v. Shank*, 05-421 (La.App. 5 Cir. 2/14/06), 924 So.2d 316, 326. Defendant never raised the issue of prosecutorial vindictiveness at the

trial court level. Although he filed a motion to quash the multiple bill, his objection was based on the validity of the predicate offenses and not prosecutorial vindictiveness. Thus, this issue is technically not properly before this Court. However, in *State v. Aleman*, 01-743 (La.App. 5 Cir. 1/15/02), 809 So.2d 1056, 1066, *writ denied*, 02-0481 (La.3/14/03), 839 So.2d 26, this Court addressed the merits of a claim of prosecutorial vindictiveness despite the defendant's failure to raise the issue at the trial court level. Thus, we will address the merits of this claim on appeal.

In light of these rulings, we will consider the issue presented.

A vindictive prosecution is one in which the prosecutor seeks to punish the defendant for exercising a protected statutory or constitutional right and thereby violates a defendant's Fifth Amendment right to due process. *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). A defendant has the burden of proving, by a preponderance of the evidence, the affirmative defense of prosecutorial vindictiveness. *State v. Sigers*, 45,423 (La.App. 2 Cir. 6/23/10), 42 So.3d 446; *State v. Stewart*, 27,049 (La.App. 2 Cir. 5/10/95), 656 So.2d 677, *writs denied*, 95–1764 and 95–1768 (La.12/8/95), 664 So.2d 420; *U.S. v. Krezdorn*, 718 F.2d 1360 (5th Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984). A defendant may establish a vindictive prosecution either (1) by producing evidence of actual vindictiveness or (2) by demonstrating circumstances that reveal a sufficient likelihood of vindictiveness to warrant a presumption of vindictiveness. *U.S. v. Jenkins*, 537 F.3d 1 (1st Cir.2008), *cert. denied*, *Jenkins v. U.S.*, 555 U.S. 959, 129 S.Ct. 433, 172 L.Ed.2d 313 (2008); *United States v. Marrapese*, 826 F.2d 145, 147 (1st Cir.1987) (citing *Goodwin*, 457 U.S. at 376, 102 S.Ct. 2485, 73 L.Ed.2d 74). If a defendant raises a presumption of vindictiveness, the prosecutor may rebut the presumption by showing objective reasons for its charges. *Id.*

The events in the case will create a presumption of vindictiveness if, to a reasonable mind, the filing . . . can be explained only by a desire to deter or punish the exercise of legal rights. *Id.*; *State v. Stewart*, *supra*; *U.S. v. Esposito*, 968 F.2d 300 (3d Cir.1992). But where the government's conduct is equally attributable to legitimate reasons, a defendant must prove actual vindictiveness for the presumption to apply. *U.S. v. Esposito*, *supra*. A mere opportunity for vindictiveness does not suffice. *State v. Stewart*, *supra*; *U.S. v. Goodwin*, *supra*; *U.S. v. Esposito*, *supra*.

*State v. Wesley*, 49,438, pp. 4–6 (La.App. 2 Cir. 2/26/15), 161 So.3d 1039, 1043–44.

In the language of assignment of error number six, Counsel references the right to trial by jury. In the issues of law section, Counsel states:

Did the State exhibit prosecutorial vindictiveness when it amended the Bill of Information to aggravated arson after over four years, with both the original and amended Bills of Information containing the same set of facts? Was the State put on notice by defense counsel's motions to quash that Dr. Rogers could not be convicted of simple arson if she owned the property? Was the Attorney General's Office vindictive when it charged Dr. Rogers with obstruction of justice due to Dr. Rogers' electing to exercise her constitutional right to trial by jury? Was the Attorney General's Office also vindictive when it threatened to charge Dr. Rogers' son as a co-conspirator, when it originally found him to be a victim?

We note that the only issue addressed in Counsel's argument concerning this assignment of error is the amendment of the bill to charge Defendant with aggravated arson.

"A vindictive prosecution is one in which the State seeks to punish a defendant for exercising a protected statutory or constitutional right." *Wesley*, 161 So.3d at 1043. As noted, Defendant mentions the right to trial by jury in the wording of her assigned error and in the issues presented. However, Defendant and Counsel, in arguing this assignment of error, do not address Defendant's right to trial by jury or link the argument regarding the 2017 amendment of the bill of information to the exercise of her constitutional right to trial by jury. Thus, Defendant has failed to prove her claim of prosecutorial vindictiveness.

**Probation Revocation:**

Defendant and her counsel assert the court was vindictive by seeking to revoke her probation despite the recommendation of Probation and Parole she be released.

On December 3, 2020, a "Compliance Report" was prepared by Probation and Parole. Therein, the probation officer noted that Defendant's compliance date was October 28, 2020. The report stated that due to COVID-19, Defendant had not done

67

any of the community service she was ordered to complete. Additionally, she had not made any payments toward her supervision fees and was $720.00 in arrears. It was, however, recommended that the case be closed on the compliance date. On December 18, 2020, the judge denied termination of the case stating, "please file for revocation." A "Motion and Order for Hearing to Revoke Probation" was filed on April 12, 2021, and set for hearing on May 19, 2021.

Appellate Counsel asserts the trial court acted vindictively when it sought to have Defendant's probation revoked despite a recommendation that her probation be terminated. Counsel further contends there can be no legitimate reason for the trial court's sua sponte action. He alleges Defendant is indigent, in poor health, and financially unable to pay her probation fees. Moreover, forcing Defendant to perform 1200 hours of community service in a medical setting in the time of COVID-19, especially given her health, is akin to a death sentence.

In her pro se brief, Defendant contends that on October 29, 2019, the judge admitted he had been irritated by the numerous motions she filed in response to the trial court's repeated constitutional deprivations. Defendant alleges the judge acted on this irritation in December 2020 when he ignored the recommendation to terminate her probation. Defendant contends she provided the trial court with evidence of her inability to pay fees and provided the State with a note from her cardiologist that stated she was unable to provide the imposed community service. Defendant asserts:

> The timing of the order to schedule a revocation hearing on April 12, 2021, immediately after appellant insisted that the trial court file her correspondence about the new arson charges added by the Natchitoches DA on July 15, 2020 during the pendency of her appeal cannot be attributed to anything other than vindictiveness to retaliate against appellant for attempting to preserve her rights. This court had to issue several orders to the trial court to explain the entry of new arson charges

on July 15, 2020 during the pendency of appellant's appeal. No legitimate explanation was ever provided to justify this mistake that was available for public view for 9 months, causing appellant to be denied employment and housing and causing appellant to be falsely accused of perjury.

The trial court also ignored its own order to record all sidebars and vindictively turned off the recorder on September 13, 2019 during a lengthy sidebar where the trial court had to regroup and figure out how they were going to find a new factual basis because of the evidentiary problems with appellant's June 22, 2012 interview.

The State argues Defendant waived review of this issue by pleading no contest and merely makes conclusory allegations of vindictiveness.

Neither Appellate Counsel nor Defendant address the law applicable to judicial vindictiveness or probation revocation procedures in their discussion of the issues in the sixth and eighteenth assignments of error. Additionally, Defendant, in her pro se brief, does not provide record page references to support her arguments, including references to events occurring on October 29, 2019, and September 13, 2019. The briefs do not comply with Uniform Rules—Courts of Appeal, Rule 2-12.4. Therefore, the claims regarding judicial vindictiveness are not considered. *Cf. Blade*, 20-172. Moreover, the revocation proceedings in this matter do not appear to be final, and if Defendant's probation is eventually revoked, she may seek review thereof via application for writ of supervisory review. La.Code Crim.P. art. 912.1(C).

**PRO SE ASSIGNMENT OF ERROR NUMBER 19:**

Defendant's nineteenth pro se assignment of error also relates to prosecutorial vindictiveness and suggests further vindictiveness by the judiciary. Specifically, Defendant contends the trial court committed legal error when it allowed the State to engage in a prohibited pattern of prosecutorial vindictiveness and other

misconduct which violated her due process rights and exceeded the accepted boundary of prosecutorial discretion.

Defendant argues that ten years of repeated constitutional deprivations clearly establishes vindictiveness. Defendant cites *Blackledge*, 417 U.S. 21, in support of her claim. Defendant asserts the trial court and the State cannot overcome the obvious vindictiveness of "their" decision to increase her simple arson charge to aggravated arson on December 17, 2017, with no new evidence or facts. Defendant writes, "The timing of this decision immediately after appellant filed a motion to reconsider her second motion for dismissal, is the prima facie evidence referred to in this court's Leger decision where the court was required to examine the 'state's actions in the context of the entire proceeding[.]'" Defendant argues the State's vindictiveness was obvious because the State withdrew its December 15, 2017 motion for recusal and engaged the services of special prosecutor Loren Lampert. When Defendant continued to assert her right to trial, Lampert disappeared on the January 8, 2018 trial date, and the State re-urged its December 15, 2017 motion for recusal, necessitating another delay. Defendant asserts the prosecutor's last-minute recusal on January 8, 2018, was upstaged by the third trial judge's decision to admit potential bias after two years of adverse rulings. Defendant contends that she continued to assert her rights, and two months later, the fourth prosecutor piled on the charge of obstruction of justice without any legitimate basis and for no other reason than to deter her from exercising her rights.

Defendant states: "The state and the trial court's vindictiveness started when appellant refused to offer Dunahoe a monetary settlement in 2012 and escalated over the next 6 years until the coup de gras pinnacle of vindictiveness of threatening to prosecute the appellant's brain damaged son just before trial." Defendant asserts

"[t]hey" retaliated against her again when she attempted to withdraw her plea by ignoring the mandates of Rule 9.13, La.Code Evid. art. 507, and the fundamental right to counsel. Moreover, the Natchitoches District Attorney added a simple arson charge back to Defendant's criminal public record on July 15, 2020, despite it previously being recused from the case and the State's agreement to dismiss the arson charge.

Defendant cites several cases in support of her claim, including *State v. Leger*, 11-1127 (La.App. 3 Cir. 5/2/12), 92 So.3d 975. In *Leger*, this court found the presumption of prosecutorial vindictiveness applied to the state's choice to charge defendant as a habitual offender where the habitual offender bill was not filed until two years after imposition of sentence, the habitual offender bill was filed shortly after the trial court's correction of defendant's illegal sentence resulted in a reduction of the original sentence, and the state had not sought to enhance the sentence under La.R.S. 15:529.1 at the plea proceeding.

Defendant's case is distinguishable from *Blackledge*, in that Defendant was not charged with a more serious offense after pleading guilty, and *Leger*. Moreover, Defendant's pro se brief does not comply with Uniform Rules—Courts of Appeal, Rule 2-12.4. Defendant does not provide any record page references to support her copious claims. Therefore, the claims of vindictiveness asserted in this assignment of error are not considered. *Cf. Blade*, 20-172.

**PRO SE ASSIGNMENTS OF ERROR NUMBERS 4, 5, & 6:**

In her fourth pro se assignment of error, Defendant contends the fourth trial judge committed legal error that violated her rights to an unbiased judge when he failed to adhere to the provisions of La.Code Crim.P. art. 674, which requires the trial judge to either grant a motion for recusal or refer the motion to another judge.

71

In her fifth pro se assignment of error, Defendant contends the fourth trial judge committed legal error when he deemed her September 2019 motion for recusal untimely since she did not discover the grounds for recusal until the judge violated her substantial rights just prior to filing her motion for recusal. In her sixth assignment of error, Defendant contends the fourth trial judge committed egregious legal error on December 5, 2018, when he deprived her of her fundamental right to compulsory jury summons shortly after his decision to bar testimony from Drs. Juneau and Nemeth. We will address these assignments of error together as Defendant did in her pro se brief.

**Motion to Recuse:**

Defendant filed a "Motion to Recuse Judge John Robinson Pursuant to Article 671 A of the Louisiana Code of Criminal Procedure" on September 5, 2019. The judge denied the motion on September 6, 2019, because it was untimely filed and did not allege valid grounds for recusal. Defendant asserts the trial court's ruling was erroneous because she filed her motion as soon as she discovered the judge allowed defense counsel to provide a transcript and audiotape of her privileged conversation without any prior notice or subpoena.

Defendant does not address the law and jurisprudence applicable to motions to recuse other than citing to La.Code Crim.P. art. 674, which sets forth the procedure for recusation of a trial judge. Additionally, she does not argue the trial court erred in finding the motion failed to allege a valid ground for recusal. Moreover, Defendant fails to mention to this court that on September 11, 2019, she filed a writ application seeking review of the trial court's ruling denying her motion to recuse and what effect this court's ruling has on her fourth and fifth assignments

72

of error. Thus, Defendant has not properly briefed the issues concerning her motion to recuse. This court previously denied Defendant's writ application, stating:

> **STAY DENIED; WRIT DENIED:** Misconduct on the part of defense counsel and/or the State is not a valid basis for a motion to recuse a judge. La.Code Crim.P. art. 671. A motion to recuse shall be filed immediately after the facts constituting grounds for recusal are discovered. La.Code Crim.P. art. 674. Defendant's disparaging remarks about the judge were brought to the attention of the judge on August 16, 2019, and the "Motion to Recuse Judge John Robinson Pursuant to Article 671 A of the Louisiana Code of Criminal Procedure" was filed on September 5, 2019. The motion was therefore untimely. *See State v. Rollins*, 32,686 (La.App. 2 Cir. 12/22/99), 749 So.2d 890, *writ denied*, 00-549 (La. 9/15/00), 768 So.2d 1278. Moreover, a trial judge is presumed to be impartial, and the burden is on the party seeking to recuse a judge to prove otherwise. The grounds for recusal based on bias or prejudice must be founded on more than conclusory allegations. Defendant pointed to no particular words or conduct *by the judge* demonstrating bias or prejudice on his part. For these reasons, the judge did not abuse his discretion when he denied Defendant's "Motion to Recuse Judge John Robinson Pursuant to Article 671 A of the Louisiana Code of Criminal Procedure." Accordingly, Defendant's writ application is denied.

*State v. Rogers*, 19-645 (La.App. 3 Cir. 9/12/19) (unpublished opinion).

Based on the foregoing, Defendant has not complied with Uniform Rules— Courts of Appeal, Rule 2-12.4, and the issue at hand is not considered.

**Compulsory Process:**

When asked about the procedure regarding the failure of summoned potential jurors to appear, the judge stated: "we're the only show in town. So, if they skip, they'll just get by away . . . they'll get away with one this time." Defendant asserts this error, occurring on December 5, 2018, deprived her of her fundamental right to compulsory jury summons shortly after the judge's decision to bar testimony from Drs. Juneau and Nemeth. She contends this was not a harmless error since the "judge's disregard for [her] fundamental rights contributed to [her] mental duress 5 days later on the day of her plea." Considering the issue presented is a pre-plea non-

jurisdictional defect, it is not properly before this court for review and will not be considered. *Johnson*, 314 So.3d 806.

**PRO SE ASSIGNMENT OF ERROR NUMBER 7:**

In her seventh pro se assignment of error, Defendant contends the fourth trial judge committed legal error when he admitted on September 13, 2019, that he participated in Defendant's plea and "'tried to help find something for appellant to plead guilty to in order to save her son.'" Defendant contends the judge tried to "conceal his participation and turned the recorder off on September 13, 2019 to thwart appellate review." Moreover, the "judge placed himself in a constitutionally impermissible dual role rather than his judicially mandated role as a neutral overseer."

On the record pages referenced by Defendant, Guilbeau was being questioned as to the factual basis for Defendant's plea, and defense counsel objected. Thereafter, the judge stated:

> Well it's relevant and I'll tell you why I think it is relevant. It's relevant because they could have put any number of those factual basis in that morning. But it was not done because we were trying[,] or everyone was trying to put language in there that was protective of Greg. That doesn't mean that there, there weren't other grounds. There were numerous. So[,] I mean I understand your argument but I would just have to . . .

Defense counsel then noted his objection for the record, and testimony continued.

Defendant also references a bench conference that occurred at the September 13 hearing:

MR. WILLIAMS: May we approach Your Honor?

**BENCH CONFERERNCE BEGINS**

**(At this time counsel approached the bench. The Court turned off the bench microphone, unable to transcribe)**

**BENCH CONFERENCE ENDS**

THE COURT: Sheriff we'll be in recess ten minutes.

**COURT RECESSED**

**COURT RECONVENED**

THE COURT: Okay so we took a break Mr. Williams, so you could I believe read over or do some checking on some dates or something.

An additional bench conference occurred during Dr. Salcedo's testimony:

MS. SLAUGHTER -YOUNG: May we approach the bench?

**BENCH CONFERENCE BEGINS**

**(At this time counsel approached the bench. The Court turned off the bench microphone, unable to transcribe)**

**BENCH CONFERENCE ENDS**

The page references provided by Defendant do not contain the statement she attributes to the judge and Defendant has failed to prove her allegations regarding Judge Robinson.

Defendant also asserts the judge "played a dual role as an unqualified psychologist" when he barred the testimony of Drs. Juneau and Nemeth at trial and ignored "uncontroverted testimony from a qualified forensic psychologist, Dr. Salcedo." In support of these claims, she references record pages that contain a portion of Dr. Salcedo's testimony given on September 13, 2019. Defendant does not reference any record page numbers regarding a ruling as to the admissibility of the trial testimony of Drs. Juneau and Nemeth as required by Uniform Rules—Courts of Appeal, Rule 2-12.4. Moreover, Defendant entered an unqualified no contest plea to obstruction of justice. Thus, any claim regarding the admissibility of trial testimony is not properly before this court for review. *Johnson*, 314 So.3d 806.

As to the testimony of Dr. Salcedo, Defendant fails to discuss the content of the testimony, why that testimony is relevant to any issue before this court, and any applicable law and jurisprudence. Thus, this issue was not properly briefed pursuant to Uniform Rules—Courts of Appeal, Rule 2-12.4 and is not considered.

**PRO SE ASSIGNMENT OF ERROR NUMBER 10:**

In her tenth pro se assignment of error, Defendant contends the trial court committed legal error and violated her fundamental right to counsel when it granted an ex parte motion from defense counsel, Guilbeau, at the time, to withdraw without the hearing mandated by "Rule 9.13." Defendant contends that had the trial court followed the proper procedure, she would have filed a motion opposing the withdrawal of defense counsel. Defendant asserts that "[i]f the court had not deprived [her] of this right, she would have advised the court that it was not her wish to discharge her defense counsel, only to obtain legal assistance in drafting her motion to withdraw her plea since her counsel refused to do so."

Defendant fails to reference the record pages on which the motion to withdraw and the ruling thereon can be located. Defendant also fails to set forth the text of Rule 9.13, where it can be found, and to address the applicability of that rule to her case. Thus, this assignment of error is not considered in accordance with Uniform Rules—Courts of Appeal, Rule 2-12.4.

**PRO SE ASSIGNMENT OF ERROR NUMBER 11:**

In her eleventh pro se assignment of error, Defendant contends that the trial court committed egregious legal error on August 16, 2019, by violating her fundamental right to effective counsel. Defendant asserts that hours of privileged testimony from Guilbeau was allowed without a valid subpoena despite repeated objections from her recently enrolled public defender who informed the court that

he had not had the opportunity to communicate with Defendant and was unprepared. Defendant cites *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984), and argues that the allowance of Guilbeau's testimony in the face of defense counsel's objections and request for a continuance was a constructive denial of counsel.

In *Cronic*, the defendant was charged with mail fraud involving a check kiting scheme. The defendant's attorney withdrew shortly before trial. The district court appointed a young attorney who practiced real estate law and had never tried a case before a jury to represent the defendant. The court allowed the attorney twenty-five days to prepare when the government had taken more than four years to investigate the case and had reviewed thousands of documents. The court of appeal reversed the defendant's convictions, inferring the defendant's right to effective assistance of counsel had been violated due to the circumstances surrounding the representation of the defendant. The inference was based on its use of the following five criteria: 1) the time afforded for investigation and preparation; 2) the experience of counsel; 3) the seriousness of the charge; 4) the complexity of possible defenses; and 5) counsel's access to witnesses. The Supreme Court addressed the lower court's ruling, expressing:

> In our evaluation of that conclusion, we begin by recognizing that the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. See *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867–869, 102 S.Ct. 3440, 3446–3447, 73 L.Ed.2d 1193 (1982); *United States v. Morrison*, 449 U.S., at 364–365, 101 S.Ct., at 667–668; *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Moreover, because we presume that the lawyer is competent to provide the guiding hand that the defendant needs, see *Michel v. Louisiana*, 350 U.S. 91, 100–101, 76 S.Ct. 158, 163–164, 100 L.Ed. 83 (1955), the burden rests on the accused to demonstrate a constitutional violation. There are, however, circumstances that are so

likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.

Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), because the petitioner had been "denied the right of effective cross-examination" which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' " *Id.*, at 318, 94 S.Ct., at 1111 (citing *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968), and *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966)).

Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

*Id.* at 658–60 (footnotes omitted). The Supreme Court continued:

[O]nly when surrounding circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial.

The Court of Appeals did not find that respondent was denied the presence of counsel at a critical stage of the prosecution. Nor did it find, based on the actual conduct of the trial, that there was a breakdown in the adversarial process that would justify a presumption that respondent's conviction was insufficiently reliable to satisfy the Constitution. The dispositive question in this case therefore is whether the circumstances surrounding respondent's representation—and in particular the five criteria identified by the Court of Appeals—justified such a presumption.

. . . .

This case is not one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel. The criteria used by the Court of Appeals do not demonstrate that counsel failed to function in any meaningful sense as the Government's adversary. Respondent can therefore make out a

78

claim of ineffective assistance only by pointing to specific errors made by trial counsel.

*Id.* at 662, 666 (footnotes omitted).

Proceedings were held on August 16, 2019, to address Defendant's motion asking that the public defender's office be relieved from representing her[16] and to allow the State to preserve evidence in opposition to Defendant's motion to withdraw her guilty plea. The State was allowed to "preserve the evidence of Mr. Guilbeau . . .[a]nd Mr. Robideaux . . . in the event that . . . they would possibly be unable to attend the hearing when it is reset." However, cross-examination would occur on a subsequent date. The record indicates defense counsel was aware the proceedings were held to preserve the testimony of Defendant's prior counsel, and he was ready to proceed. Defense counsel made numerous objections during Guilbeau's testimony. Those objections were based on the admissibility of a taped conversation, Guilbeau's ability to determine Defendant's state of mind, privilege, legal opinion as to a fact at issue, the witness's ability to address the court outside answers to specific questions, the admissibility of or reference to a video, and the admissibility of a transcript. At the conclusion of Guilbeau's testimony, defense counsel reserved the right to cross-examine Guilbeau. Guilbeau subsequently asked to be cross-examined that day. In response, defense counsel stated:

> The only problem is I'm not prepared. I don't, I know you don't know the history but I just received this case. I just got this case and we have not had enough time to prepare for your cross-examination nor have we had time to kind of prepare our case in chief for the motion to withdraw. I kind of extended the courtesy to Ms. Slaughter-Young to give her the opportunity to go ahead and preserve your testimony. It's not a guarantee that I'll need you, to be honest with you. And if I don't think, if I have conversations with Dr. Rogers and I feel like it's unnecessary, I'll definitely give you the courtesy of telling you way ahead of time.

---

[16] That motion was withdrawn.

79

> But I hate to cross you off and just say I'm not going to need you because if something arises and I do need you. But I agree.

Thereafter, Robideaux was questioned by the State, and defense counsel also reserved the right to cross-examine him.

This case is clearly distinguishable from *Cronic*. Defense counsel participated in the proceedings and reserved his right to cross-examine the witnesses. Thus, Defendant was not without counsel. Accordingly, this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 15:**

In her fifteenth assignment of error, Defendant contends the trial court committed patent legal error when it ignored the requirements of La.Code Evid. art. 507. According to Defendant, La.Code Evid. art. 507 requires advance notice before any privileged testimony can be elicited from defense counsel. Defendant asserts the following complaints: 1) she was deprived of her right to challenge the admissibility of privileged testimony irrelevant to her complaints about deficiencies by her attorneys Guilbeau and Robideaux; 2) the State never explained how it obtained her privileged emails without a subpoena or how it had a typed excerpt of her privileged conversation with defense counsel at the August 16, 2019 hearing before she was provided with a copy; 3) she was denied the right to have advanced notice and an evidentiary hearing; 4) she should have received notice of the State's intent to elicit privileged testimony and should have been afforded the opportunity to oppose that at an evidentiary hearing; and 5) she should have been given the opportunity to file a motion to limit any privileged testimony and the opportunity to file a writ if the trial court did not limit Guilbeau's hours of privileged testimony. Defendant alleges the judge allowed Guilbeau to testify for hours without a subpoena

that complied with the provisions of La.Code Evid. art. 507. Defendant contends an "instant" subpoena was issued to Guilbeau to elicit privileged testimony "over strenuous objections of the public defender who informed the court that he was not prepared." According to Defendant, the judge admitted regret that he had not prepared to protect her by having an evidentiary hearing and admonished Guilbeau several times during his testimony for over-disclosure of privilege.

Louisiana Code of Evidence Article 507 addresses the issuance of subpoenas to lawyers in criminal cases:

> **A. General rule.** Neither a subpoena nor a court order shall be issued to a lawyer or his representative to appear or testify in any criminal investigation or proceeding where the purpose of the subpoena or order is to ask the lawyer or his representative to reveal information about a client or former client obtained in the course of representing the client unless the court after a contradictory hearing has determined that the information sought is not protected from disclosure by any applicable privilege or work product rule; and all of the following:

> (1) The information sought is essential to the successful completion of an ongoing investigation, prosecution, or defense.

> (2) The purpose of seeking the information is not to harass the attorney or his client.

> (3) With respect to a subpoena, the subpoena lists the information sought with particularity, is reasonably limited as to subject matter and period of time, and gives timely notice.

> (4) There is no practicable alternative means of obtaining the information.

> **B. Waiver.** Failure to object timely to non-compliance with the terms of this Article constitutes a waiver of the procedural protections of this Article, but does not constitute a waiver of any privilege.

As previously noted in assignment of error eleven, the August 16, 2019 proceedings were held to address Defendant's motion asking that the public defender's office be relieved from representing her and to allow the State to preserve

the testimony of Guilbeau and Robideaux as part of the hearing on Defendant's motion to withdraw her plea. Cross-examination was to be had at a later date.

Defendant references record pages which contain a "Motion to Strike Testimony of Attorney Thomas Guilbeau and Attorney Jason Robideaux Due to Noncompliance with Article 507 of the Louisiana Code of Evidence" that was filed on September 12, 2019. Therein, counsel for Defendant asserted that on August 16, 2019, the Assistant Attorney General elicited testimony protected by attorney-client privilege from Guilbeau and Robideaux, and Defendant was not provided copies of the subpoenas issued to her former attorneys in compliance with La.Code Evid. art. 507. Defendant obtained a copy of the subpoenas after the August 16 hearing and discovered the subpoenas failed to comply with La.Code Evid. art. 507, resulting in severe prejudice to her. The order attached to Defendant's motion to strike dealt with amending the minutes of May 28, 1998, in docket number 978,337 and imposition of a twenty-one year sentence. On October 29, 2019, the judge wrote, "Obviously wrong Order for this motion."

Defendant also references record page 11-A, minutes of court from August 16, 2019. Those minutes state: "Court relieved Mr. Guilbeau from any attorney/client privileges."

Defendant additionally references the subpoenas issued to Robideaux and Guilbeau to appear on August 16, 2019, which were personally served on August 16, 2019. She further references Guilbeau's request to be cross-examined at the August hearing. Defense counsel asserted that he could not conduct cross-examination because he had just received the case and was not prepared to do so.

Defendant asserts the trial judge "admitted regret that he had not prepared in advance to protect appellant by having evidentiary hearings and admonished Guilbeau several times during his testimony for over disclosure of the privilege."

Defendant fails to discuss defense counsel's filing of a second "Motion to Strike Testimony of Attorney Thomas Guilbeau and Attorney Jason Robideaux Due to Noncompliance with Article 507 of the Louisiana Code of Evidence" on September 13, 2019, which was identical to the motion filed on September 12, 2019. The motion was taken up at a hearing held on September 13, 2019. After hearing the arguments of the parties, the trial court found:

> Initially 507 is only applicable to confidential, privileged information. My recollection of Mr. Guilbeau's testimony, the vast majority of it did not involve anything that could be argued to have been privileged. Now to be honest with you before earlier today I was, I was thinking well about the, what about that transcript of the taped interview that took place I think December 18th in Mr. Guilbeau's office. So I'm thinking okay well 507 may apply to that. That would have appeared to have been privileged and would have required compliance with 507. Then I realized after counsel's argument and looking back over Dr. Rogers' motion to withdraw her guilty plea with the rather voluminous affidavit attachments attached to it, that, that she specifically referenced that conversation, thereby opening the door to the State and so I did find that the portion of, any portion of Mr. Guilbeau's testimony could be argued to have been privileged was that privilege waived specifically by Dr. Rogers in her attachments to the motion. And for those reasons the motion to strike is denied. Mr. Williams your objection to that ruling is certainly noted for the record for all the reasons stated in your argument.

Defendant fails to acknowledge the proceedings held on September 13, 2019, and to address the effect the trial court's ruling on her motion to strike has on the claims asserted in this assignment of error. Thus, Defendant has failed to properly brief the issue in compliance with Uniform Rules—Courts of Appeal, Rule 2-12.4.

Additionally, Defendant does not point to record evidence in support of her claim that she was deprived of her right to challenge the admissibility of privileged

testimony in violation of Uniform Rules—Courts of Appeal, Rule 2-12.4. Furthermore, a review of the proceedings held on August 16, 2019, does not indicate defense counsel was prohibited from objecting to the testimony of Guilbeau and Robideaux.

Defendant's claim regarding the State's alleged failure to explain how it received privileged emails and had typed excerpts thereof has not been addressed. Defendant fails to cite to record references wherein this issue was raised, any objection thereto, and the law applicable to the issue presented. Thus, this issue has not been properly briefed and is not considered by this court. Uniform Rules— Courts of Appeal, Rule 2-12.4.

**PRO SE ASSIGNMENT OF ERROR NUMBER 16:**

In her sixteenth pro se assignment of error, Defendant contends the trial court committed legal error by barring testimony from her expert witnesses, Drs. Juneau and Nemeth, five days prior to trial and immediately after the State advised the trial court that it was charging Defendant's son as a co-conspirator. This issue was also raised in pro se assignment of error number seven. Defendant suggests these expert witnesses would have protected her and her son, Hall, from the obstruction of justice charge because they were prepared to testify that Hall's testimony was not reliable due to his severe brain injury. Defendant cites *State v. Compton*, 367 So.2d 844 (La.1979), in support of her claim.

Defendant alleges that in *Compton* the supreme court reversed a trial court's decision to deny a defendant's motion to withdraw his plea, despite the fact that he waived his rights, because the trial court barred the defendant from presenting testimony relevant to his defense. We note that the *Compton* court actually set aside the defendant's plea to one of four counts because the trial court prohibited defense

counsel from fully questioning the victim on that count at the hearing on the defendant's motion to withdraw his plea.

Defendant does not reference any record page numbers regarding the ruling at issue in this assignment of error as required by Uniform Rules—Courts of Appeal, Rule 2-12.4. Moreover, Defendant entered an unqualified no contest plea to obstruction of justice. Thus, Defendant's assignment of error is not properly before this court for review. *Johnson*, 314 So.3d 806.

## PRO SE ASSIGNMENT OF ERROR NUMBER 17:

In her seventeenth pro se assignment of error, Defendant contends the State committed prejudicial legal error and misconduct when it failed to inform her that a key witness who had conducted an interview admitted into evidence in June 2018 was unavailable to authenticate said evidence. Defendant asserts that Rick Abbott, who interviewed her son in September 2014, was unavailable because he was a fugitive since he failed to appear for sentencing after he was convicted of aggravated arson in Orleans Parish. Defendant asserts that in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173 (1959), the Supreme Court concluded that nondisclosure of evidence affecting witness credibility was a denial of due process.

In *Napue*, the Supreme Court held that when a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness.

> To prove a *Napue* claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. When a prosecutor allows a state witness to give false testimony without correction, a conviction gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. [*Napue v. Illinois*, 360 U.S. 264]

85

at 269, 79 S.Ct. 1173 [(1959)]. Furthermore, fundamental fairness to an accused, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

*State v. Broadway*, 96-2659, p. 17 (La. 10/19/99), 753 So.2d 801, 814, *cert. denied*, 529 U.S. 1056, 120 S.Ct. 1562 (2000).

Defendant pled no contest in this matter. Moreover, her claim does not involve an allegation of false testimony. She alleges the State failed to inform her that Abbot was unavailable because he was a fugitive. Thus, Defendant has not set forth a claim under *Napue*. Furthermore, she provides no proof of her allegations. Accordingly, this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 20:**

In her twentieth pro se assignment of error, Defendant contends that the State committed reversible legal error and violated her right to due process by failing to provide exculpatory evidence seized during execution of a July 19, 2012 search warrant. Defendant asserts this failure occurred despite numerous discovery requests from the defense, and it violates a fundamental right espoused by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

To prove a *Brady* claim, Defendant must satisfy a three-prong test: "1) favorable (impeaching or exculpatory) evidence; 2) that must have been withheld; and 3) prejudice must have been caused thereby." *State v. Sparks*, 88-17, p. 68 (La. 5/11/11), 68 So.3d 435, 486, *cert. denied*, 566 U.S. 908, 132 S.Ct. 1794 (2012).

Defendant fails to discuss the details of the July 19, 2012 search, identify the particular items of evidence at issue, and address why she considers that evidence exculpatory. Accordingly, this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NUMBER 21**:

In her twenty-first pro se assignment of error, Defendant contends the State committed legal error that violated her rights when it denied existence of any financial recovery that would establish Jared Dunahoe as a potential suspect. Defendant argues that by denying the existence of this information, she was deprived of challenging the credibility of a key, material witness for the prosecution. She also argues the State did not investigate any other person who may have had motive, means, and opportunity to commit the arson and suppressed any exculpatory evidence that did not fit its investigation. Defendant then discusses the motives of Jared and Ed Dunahoe.

Defendant entered an unqualified no contest plea to obstruction of justice and the aggravated arson charge was subsequently dismissed. Thus, Defendant's assignment of error is not properly before this court for review. *Johnson*, 314 So.3d 806.

**DECREE**:

For the foregoing reasons, Defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PULICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3